THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID L. HENDRIX, Defendant-Appellant.

First District (6th Division)   No. 1—90—3051

Opinion filed July 16, 1993.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Catherine A. Hufford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, David Hendrix, of first degree murder, aggravated criminal sexual assault and residential burglary. He was sentenced to an extended term of imprisonment of 80 years for murder, 30 years for aggravated criminal sexual assault and 15 years for residential burglary; the sentences were to run concurrently. The defendant maintains that the evidence failed to establish his guilt beyond a reasonable doubt; that numerous trial errors denied him a fair trial; and that sentencing was improper.

Monica Janetzke is the daughter of the deceased, Rozalia Zieba. She testified that her mother lived alone at 1809 North Hermitage in Chicago and worked as a janitor at Commonwealth Edison. March 12, 1989, was her mother's 71st birthday. Her mother did not speak fluent English and could not read English. Monica last spoke with her mother on Sunday, March 5. Her mother had been given time off from work on March 13. Monica was unable to reach her mother on the phone either during that weekend or on Monday, but she was unconcerned because her mother had a habit of disconnecting the phone.

About 6:50 p.m. on Tuesday, March 14, Monica received a call from her mother's employer, who told her that her mother had not

come to work. Monica and her husband went to her mother's house, where they found items scattered around the house. Her mother generally had items stacked in the rooms of her house, but the disorder in the house was unusual; items were scattered in the walkways. When Monica turned on the hallway light, she could see her mother's body lying face down on the floor in a pool of blood. The body was nude from the waist down and flowers were placed on her mother's buttocks. Monica and her husband went next door to call the police.

Monica and her husband returned to her mother's house on March 25, 1989. Monica found a bankbook with a balance of $300 and three uncashed paychecks. She testified that her mother had a habit of rubber-banding and paper-clipping loose change in cone-shaped paper cups. Her mother did not smoke.

Monica's husband, Thomas Janetzke, testified that he found writings in the garage behind the deceased's house. He remembered the names "Homicide Hendrix" and "Peabody." He also found a wallet near a cart that had blankets piled in it. The wallet contained the defendant's social security card, birth certificate, and a poem or song entitled the "Jouster's War Anthem." From the floor of the garage he recovered paper cups along with some pennies; he knew that his mother-in-law had stored change in these types of cups which she kept in the house. His mother-in-law did not go into the garage much because it had been closed up for years. The outside door, however, was broken so that entrance could be gained through it.

Dr. Michael Chambliss performed an autopsy on the deceased on March 15, 1989. An external examination revealed two lacerations on the left side of the forehead, multiple lacerations on the back of the head, and bruises on the right eye and left side of the mouth. The body showed signs of decomposition. He estimated that death occurred approximately 30 to 48 hours before the discovery of the body. He determined that the victim died of cranial cerebral injuries, secondary to blunt trauma. It was his opinion that the injuries to the head were consistent with those that could be inflicted with a baseball bat and the use of significant force. A vaginal examination revealed two lacerations inside the vagina with areas of bruising. Based on the lacerations and bruises within the vaginal area, he determined that the victim had been sexually assaulted. However, he could not determine the exact time of the sexual assault. He testified that the sexual assault was caused by some unknown object and not from the insertion of a penis. It was stipu-

lated that vaginal, oral, and rectal swabs tested negative for the presence of semen or spermatozoa.

Officer Jose Rivera knew the defendant and that his nickname was "Homicide." He went to an apartment in the 1800 block of Hermitage and spoke to Dan Rodifer, and Jennifer and Cecil Bryant, a brother of Jeffrey Bryant. Cecil Bryant went with Rivera and his partner, Vincent Mancini, and toured the general area. Cecil told Rivera "if [he] could find David Hendrix, [he] could find Jeffrey Bryant."

Rivera found the defendant walking near the corner of Hermitage and Cortland. Rivera testified that the defendant said he had not seen Jeffrey Bryant and agreed to assist the officers in locating him. Cecil Bryant and the defendant went in the officers' car to the Metra train station looking for Jeffrey Bryant. Rivera received a radio message from Sergeant Kijowski informing him that Jeffrey Bryant had been arrested. Rivera returned to the station and picked up Jeffrey Bryant. Both the defendant and Jeffrey Bryant were taken to Area Five detective headquarters in separate vehicles.

Rivera testified that he had known the defendant from the neighborhood for approximately two or three years. He did not grab the defendant on the corner of Hermitage and Cortland; the defendant voluntarily accompanied him. The defendant was not handcuffed at any time. Rivera did not handcuff the defendant in the station. He did not speak to the defendant after placing him in the interview room. He denied striking the defendant.

John Naujokas, a technician for the Chicago crime detection laboratory, photographed the murder scene and dusted the premises for fingerprints. He recovered two cigarette butts from the kitchen sink and a blood standard from the immediate area where the deceased was found. The cigarette butts revealed no fingerprints. Two fingerprints that were recovered did not belong to the defendant or Bryant.

Thomas Krypowicz, a fingerprint examiner, was unable to determine if the prints on the refrigerator were from the deceased because the inked impressions of the deceased's fingerprints were unreadable due to the decomposition of the body.

Detective William Dorsch was assigned to the investigation with his partner, Detective Boyle. When he entered the deceased's house, he observed the living room to be very cluttered; there was writing on the wall made by black and red markers. There were three separate writings which in substance were warnings to the

deceased to leave $100 on the television set or her house would be burned down. Several of the words in the writings were misspelled. The deceased lay on the dining room floor. Her body was naked from the waist down and she was severely battered about the head. He observed Marlboro cigarettes in the toilet. The glass in the rear door of the kitchen had been broken. A cabinet had been placed against the door, but entry could be gained through the window.

Dorsch also examined the garage that was 30 feet to the rear of the house. He observed mattresses, candles, cups and blankets and writings on the garage door and boxes. Repeatedly written in the garage were the names "Homicide Hendrix" and "Peabody." There were other words written in the garage under the label "R.I.P," which included "Rebel" "Man," "Dago," and "Michael Trear." On a box containing hubcaps were written "Homicide Hendrix lives," "Peabody," and "Taylor Street Jousters."

Dorsch learned that Jeffrey Bryant, known as Peabody, and the defendant, known as Homicide, were at Area Five detective headquarters. The defendant and Bryant were in separate interrogation rooms. After Dorsch and Boyle introduced themselves to the defendant, they spoke with Bryant for about 30 minutes. Dorsch observed Bryant smoke during the interview. Dorsch and Boyle first spoke with the defendant at approximately 11:30 p.m. The defendant was advised of his *Miranda* rights, which he indicated that he understood. The defendant told the detectives that he was living in the neighborhood, that he knew Bryant and his nickname, "Peabody." He also said that his own nickname was "Homicide." The defendant said he was not in a gang but he had friends who were in the Jousters, a street gang.

The defendant denied having ever been in the deceased's garage or house. He later said, "There is nothing in that woman's house that I would want. She has got nothing there. It is a mess." When Dorsch asked how the defendant knew what was in the house, the defendant replied, "Well, I'm around. I visit with Jeffrey, all right? I know she goes to work and she comes home, and that's all I know about it." The defendant's interrogation was interrupted when Bryant's family arrived at the station and Dorsch left to speak to them.

The defendant was questioned by Dorsch a second time. Dorsch told him that he had learned that the defendant had told other officers that he had stayed in the garage on occasion. The defendant said that he had been with Dan Rodifer during the past weekend. The defendant spelled various words so that a comparison could be

made to the writings on the living room wall which contained many misspellings. The defendant spelled each word correctly. (Dorsch later testified that Bryant misspelled the words just as they were misspelled in the writings on the wall.) Dorsch called Dan Rodifer to confirm the defendant's alibi. Dorsch informed the defendant that Rodifer denied that he had spent any time with, or spoken to, the defendant during the previous weekend.

At that point the defendant admitted that he had stayed in the garage. He said that he spent some time in the garage, but that Bryant normally slept there. On the Saturday before the killing, the defendant and Bryant were in front of the victim's house and Bryant told the defendant that he was going inside for some food. The defendant remained outside while Bryant entered through the rear door. The defendant could see Bryant inside the house. Bryant was in the house for about 45 minutes. After he left the house, Bryant told the defendant to get away from the house and not to come back.

Dorsch left the interrogation room and went to another office and wrote a summary of the defendant's version of events. Dorsch read the version back to the defendant, and Dorsch then crossed out the portion that said that the defendant stayed outside while Bryant went in the house. Dorsch wrote "B.S." on this portion of the summary, and the defendant replied, "Bull shit." Dorsch told the defendant to tell the true story. Dorsch told the defendant that he and Bryant went in the house on other occasions to get money from the deceased. Dorsch also told the defendant that he knew that the defendant and Bryant had already taken items from the deceased's house and that the defendant was present when the deceased was hit with the baseball bat. The defendant then said that he would tell the truth.

The defendant told Dorsch that he had gone with Bryant to look for the $100 that the deceased was supposed to have left for them. This was the second time that the defendant entered the house to look for money and the third time that they had entered the house. When the deceased came home, the defendant was gathering up items to take. The defendant heard screaming and saw Bryant hitting the deceased with a baseball bat. The defendant did not want to watch the beating, so he left the house.

He admitted to sleeping in the garage at times. He knew about the deceased's schedule, that she worked nights, usually left in the early afternoon and returned home late in the morning. Dorsch

then told the defendant that he was under arrest. Dorsch did not question him again.

Dan Rodifer testified that he was not with the defendant on the weekend of March 11 or 12, 1989. He had last seen the defendant four days before the defendant's arrest.

Mary Siwak, a police officer with the gang crimes division, met with the defendant on July 29, 1987. At that time, the defendant told her that his nickname was "Homicide" and that he was a member of the Jouster street gang.

Ira Kaufman, a lawyer, testified for the defendant. He spoke to the defendant at around 10:30 a.m. on March 15. After his conversation with the defendant, he requested that the police stop physically abusing and hitting the defendant. Kaufman said that he saw no signs of abuse on the defendant; he also said that he did not really look for any visible sign of injury.

Nathaniel Hendrix, the defendant's brother, testified that his nickname used to be "Homicide Hendrix" when he was a professional boxer. He was a former member of the Taylor Street Jousters, a gang which was no longer in existence. He did not write "Homicide" or "Peabody" on the walls, and the "Homicide Hendrix," which was written on the walls of the deceased's garage, did not refer to him.

Jill Edwards, a friend of the defendant, testified that the defendant was at her home from the time she awoke on Sunday morning, March 12 until 2:30 p.m. on Monday, March 13. She knew the defendant had been arrested, but she did not go to the police station. She did not know where the defendant had been on March 10 or March 11.

Resolution of the defendant's claim that he was not proved guilty beyond a reasonable doubt depends on the admissibility of his statement to Officer Dorsch. Consequently, we will first address the defendant's claims that the statement was the result of an illegal arrest and of subsequent coercion.

The defendant and Bryant both made motions to quash arrest, suppress statements and for a severance. Although their trials were severed, their motions to quash arrest and suppress statements were heard together.

On the motion to quash arrest, the defendant testified that he was picked up at Hermitage and Cortland at 9 p.m., March 14, when he was stopped by two undercover police officers, later identified as Officers Rivera and Mancini, who asked if he was David Hendrix. When he said that he was, he was put into the back seat

of the officers' car. There were no handles for the car door in the back of the vehicle. Jeffrey Bryant's older brother, Cecil, was in the car. The officers were looking for Jeffrey Bryant. After the defendant told the police that Bryant "hung out" at the Metra train station, the police drove there. He was not handcuffed while in the car and did not leave the car at the Metra station. When they arrived at the Metra station, a radio message informed the officers that Jeffrey Bryant was in custody. The officers then drove back to the home of the deceased at 1809 North Hermitage.

At the scene, Cecil Bryant was let out of the car, and he walked away. The defendant testified that he was then handcuffed when he left the car. Once handcuffed, the defendant was put back in the car and remained there for approximately an hour to an hour and a half. He was taken to the police station at Grand and Central, placed in an interrogation room and then handcuffed to the wall.

Detective Dorsch testified for the first time on the motion to quash the arrest. His testimony was in substance the same as his testimony later in the trial before the jury. (He also testified at the motion to suppress statements.) In addition to his testimony at trial, he testified that he spoke with Mr. Zimmerman, a next-door neighbor of the deceased, between 9:30 p.m. and 10 p.m. on March 14. Zimmerman said that there were two young men that frequently had broken into the deceased's garage and caused her problems; they had broken her windows and had taken up residence in the garage from time to time. He learned the identity of the two young men from Zimmerman. Dorsch knew them as "Mr. Bryant and Mr. Hendrix." Dorsch also believed that Zimmerman knew their names and had given their names to him. Zimmerman told Dorsch that, although the deceased had numerous problems with the boys, she did not call the police because of her language problem. Zimmerman told Dorsch that he had to call the police for her on several occasions but did not know whether any arrest was ever made. Zimmerman had seen one of the boys, Bryant, leaving the garage at 6:30 a.m. on Sunday, March 12.

Dorsch also spoke to Monica Janetzke. Dorsch left the deceased's home after being informed that the defendant and Bryant were at Area Five headquarters. Around 10:30 p.m., Dorsch saw the defendant in an interview room. The defendant was not handcuffed, and the interview room door was closed but not locked. Dorsch said that the defendant was not formally placed under arrest until he gave his incriminating statement to Dorsch later at 3:30 a.m. on March 15.

On cross-examination, Dorsch testified as follows:

"Q. Was Mr. Hendrix free to leave at 10:30 p.m.?

A. He didn't ask to leave, but I didn't want him to leave, I wanted to talk to him.

Q. If he had tried to leave, you would have kept him there?

A. Yes."

Officer Rivera's testimony was also substantially the same as his later testimony before the jury. In addition, he testified that Sergeant Kijowski told him that Bryant had been staying in the garage for approximately the past month. Rivera had had contact with Bryant and knew his nickname was "Peabody." Neither Bryant nor the defendant was handcuffed at the scene. There were handles in the back seat of the car. Rivera asked the defendant if he would accompany him back to detective Area Five, and the defendant said that he would "cooperate thoroughly, completely. He [the defendant] had nothing to hide."

The trial judge concluded that the police had probable cause to arrest the defendant. The defendant maintains that the judge erred.

There is some uncertainty about the parties' positions as to the time of the arrest. We conclude that it is now the defendant's position that he was arrested at the time he was questioned by Detective Dorsch initially at approximately 10:30 p.m. on March 14. Citing *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the defendant relies principally on Dorsch's testimony that he would not have permitted the defendant to leave the station if he tried to leave. The State does not dispute the claim that the defendant was under arrest when Dorsch questioned him. The issue, therefore, is whether Dorsch possessed probable cause to hold the defendant in custody at the time Dorsch first questioned him.

Our immediate task is to determine the proper standard on review of an order finding probable cause to arrest. In *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280, the supreme court said that a reviewing court may not disturb a finding that police officers had probable cause to arrest the defendant unless the finding was manifestly erroneous. *Clay* was followed in *People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86, 508 N.E.2d 708, 712, *People v. Foster* (1987), 119 Ill. 2d 69, 83, 518 N.E.2d 82, 87, and *People v. Evans* (1988), 125 Ill. 2d 50, 71, 530 N.E.2d 1360, 1368.

However, in *In re D.G.* (1991), 144 Ill. 2d 404, 408-09, 581 N.E.2d 648, 649, the supreme court said the following:

"Whether probable cause exists is a mixed question of law and fact. (*People v. Lippert* (1982), 89 Ill. 2d 171, 177.) Ordinarily, a trial court's ruling on a motion to quash will not be reversed unless manifestly erroneous. (*People v. Foskey* (1990), 136 Ill. 2d 66, 76.) However, where neither the facts nor credibility of the witnesses is contested, the issue of whether probable cause exists is a legal question which a reviewing court may consider *de novo*. *Foskey*, 136 Ill. 2d at 76."

The *Foskey* case, however, cited in *In re D.G.*, did not involve the issue of probable cause. In fact, the court expressly found that probable cause existed. The issue in *Foskey* was whether exigent circumstances existed which would justify the warrantless arrest of a defendant in his home.

We note that the Seventh Circuit Court of Appeals discussed differing views on the appropriate standard on review of a finding of probable cause for a warrantless arrest. (See *United States v. Holifield* (7th Cir. 1992), 956 F.2d 665; *United States v. Spears* (7th Cir. 1992), 965 F.2d 262.) In *Spears*, the court of appeals resolved the differing views. It held that some deference must be given to a trial judge's finding of probable cause and adhered to the view that in warrantless cases the "review must be for clear error" (*Spears*, 965 F.2d at 270); it rejected any rule that required review *de novo*.

The *Spears* court pointed out that in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, the Supreme Court forcefully held that review of the sufficiency of affidavits supporting an application for a search warrant should not be made *de novo*. The *Spears* court reasoned that there is no basis for different rules in nonwarrant cases and warrant cases:

"As we read *Gates*, we review the magistrate's probable cause determination deferentially. The *McKinney* [(7th Cir. 1990), 919 F.2d 405] concurrence notes that it is a determination the magistrate makes in an *ex parte* proceeding. It would be anomalous to require a more searching review of a district judge's probable cause determination, made after a full adversary proceeding. *McKinney*, 919 F.2d at 422. Because there is little to distinguish a magistrate's probable cause determination in a warrant case and a district judge's probable cause determination in a nonwarrant case, appellate review should be the same for both." *Spears*, 965 F.2d at 270.

Although *Spears* is not binding on Illinois courts of review, we believe its reasoning to be sound. Further, we believe the greater weight of supreme court precedent supports the view that review of a trial judge's finding of probable cause in a nonwarrant case is to be made under a clearly erroneous standard and not a *de novo* standard. In short, we believe that some deference is to be given to the views of the trial judge who passes on the question of whether probable cause existed to effect an arrest.

Probable cause exists if the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. More is required than mere suspicion but it does not require that the officers have evidence sufficient to convict. In *People v. Cabrera*, the supreme court spoke thus:

> "The courts, in striking a balance between the need to protect citizens from invasions of their privacy at the whim of police officers and the countervailing need to allow leeway for efficient enforcement of the laws, are sensitive to the fact that policemen must often make their decisions to arrest or not to arrest under ambiguous circumstances and must exercise their judgment, at the risk of making a mistake. 'In dealing with probable cause, *** as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'[Citation.]" *Cabrera*, 116 Ill. 2d at 485, quoting *People v. Moody* (1983), 94 Ill. 2d 1, 7-8.

We turn now to the facts known by Detective Dorsch. He knew, of course, that a murder had been committed; he was informed that Bryant and the defendant were always together and that both of them had "caused problems" for the murdered woman and had broken into her garage, 30 feet away from the home in which she was killed. He was also informed that one of the inseparable pair, Bryant, was seen leaving the garage at 6:30 in the morning, two days before her body was found. Dorsch also knew that the deceased had been dead for some time. Dorsch saw the name and nickname of the defendant and the nickname of Bryant on the walls of the garage; he saw the written matter on the wall of the deceased's home showing threats against the deceased which necessarily indicated that someone had broken into the deceased's home. It would not be unreasonable for Dorsch to infer that the persons

who broke into the deceased's garage would also break into her home. Under these circumstances, Dorsch acted reasonably and prudently and not as a legal technician might have. The trial judge did not err in finding that Dorsch had probable cause to arrest the defendant.

The defendant has cited a number of cases which upheld findings of probable cause. (*E.g., People v. Davis* (1981), 98 Ill. App. 3d 461, 424 N.E.2d 630.) The defendant points to those cases for comparison purposes. We would not be honest if we were to say that the evidence of probable cause in this case is as strong as the evidence in the cases cited by the defendant for comparison purposes. But the test is not whether the evidence could have been stronger; the test is whether it was strong enough. The trial judge concluded that it was, and we cannot say that his conclusion was clearly erroneous.

The defendant also cites *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, and *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635. *Creach*, in our judgment, supports the State's position. In *Cole*, the State conceded that the arrest was without probable cause.

The State also argues alternatively that, even if the arrest was illegal, the evidence is strong that any illegality of the arrest was attenuated by subsequent circumstances and had no effect on the voluntariness of the defendant's statement. We concede that the State has made an appealing argument, but we will not address it. This is an argument often made by the State, unfortunately for the first time on appeal. Whether attenuation has occurred is a question of fact to be decided by the trial judge. We have previously remanded cases to the trial court for the express purpose of conducting attenuation hearings after we have determined an arrest was illegal. (See, *e.g., People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983.) The judge's subsequent orders after the attenuation hearing have been appealed. Consequently, to avoid piecemeal appeals and for the sake of judicial economy, we suggest that the State, rather than roll the dice on the single question of the legality of the arrest, raise the alternative question of attenuation in the trial court; and we suggest further that the trial court pass on the question of attenuation.

The defendant testified on his motion to suppress his statement that when he was first questioned by Officer Rivera in the car he admitted spending nights in the garage. He was then taken to headquarters and handcuffed to a chair with his hands behind his

back. Neither Rivera nor Mancini advised him of his *Miranda* rights. He told them that he would plead the fifth amendment until he got an attorney. He was handcuffed to a metal ring in a wall and struck in the chest and stomach. The blows left no marks, but the beatings hurt him and he was "scared." Dorsch came into the room, and the defendant still refused to give a statement. He specifically denied that he ever gave a statement to Dorsch. He was shown the motion to suppress, which he signed and which alleged that he had given "a statement incriminating himself" to the police. He said that he signed the motion without reading it and that the allegation that he gave a statement incriminating himself was incorrect. He saw Ira Kaufman more than 12 hours after he saw Dorsch and told Kaufman that he had been beaten by the police; he asked Kaufman to have the police stop beating him.

Ira Kaufman also testified on the motion to suppress the statement. He said that he saw the defendant on March 15 between 10:30 and 11 a.m. The defendant was in a waiting or detention room. The defendant told Kaufman that he had been beaten, that he had no visible marks and that he had been hit in the stomach area. Kaufman advised the defendant not to say anything to the police and to tell the police to call Kaufman if they tried to question him. The defendant told Kaufman that he had not told the police anything. Before leaving, Kaufman told a sergeant about the defendant's complaint and asked that he not be questioned.

Officers Rivera and Mancini testified that the defendant was left in an interrogation room and was not handcuffed at that time. They denied beating the defendant, seeing him beaten or that the defendant ever asked for an attorney or pleaded the fifth amendment.

When a defendant challenges the voluntariness of a statement, the State is required to establish by a preponderance of the evidence that the statement was in fact voluntary and the result of a knowing and intelligent waiver of basic constitutional rights. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.) It is the trial judge's duty to resolve conflicts in the evidence and determine the credibility of the witnesses. (*People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675.) A reviewing court will not disturb the trial court's determination on a motion to suppress evidence unless that finding is against the manifest weight of the evidence. *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958.

■ No purpose would be served by repeating the testimony of the witnesses. Suffice it to say that this case presented a question

of fact which was to be decided by the trial judge on the basis of the credibility of the witnesses. The judge obviously believed the police officers and did not believe the defendant, who was impeached. Ira Kaufman's testimony was simply the recitation of self-serving remarks made to him by the defendant, whom the judge did not believe.

A reviewing court is required to defer to the findings of the trial court where that court has assessed credibility, the witnesses' demeanor and all relevant facts. (*People v. Reid* (1990), 136 Ill. 2d 27, 554 N.E.2d 174.) The record does not reflect any reason for us to substitute our judgment for that of the trial judge. For these reasons, we hold that the judge did not err by denying the motion to suppress the defendant's statement to Detective Dorsch. We turn now to the defendant's claim that he was not proved guilty of murder beyond a reasonable doubt.

■ The defendant concedes that the *corpus delicti* of murder and residential burglary have been proved. In substance, he asks that we discount the weight of the statement he made to Detective Dorsch. We point out that the weight to be given any statement made by a defendant is for the finders of fact. The arguments raised by the defendant on this point are in essence the same arguments that he raised in arguing his claim that his statement was coerced. We conclude, therefore, that the defendant's guilt of murder has been established beyond a reasonable doubt.

The defendant next maintains that he was not proved guilty of aggravated criminal sexual assault. We must address the issues as the parties have presented them. The defendant argues that there is insufficient evidence to show that *anyone* sexually assaulted the deceased and, if there is, there is insufficient evidence to show that the sexual assault occurred before the death of the victim.

It is the defendant's position that the State's entire case depends on the testimony of Dr. Chambliss. Dr. Chambliss found bruising inside the vaginal area. He identified photographs of the inside of the vagina, which showed two lacerations. In his opinion the lacerations were caused by a "foreign object," and not a penis. In his opinion the deceased was "a victim of a sexual assault." (See *People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241.) The lacerations could not have been caused by an external blow. The lacerations were caused just before or shortly after death.

The defendant has cited *In re B.J.S.* (1987), 151 Ill. App. 3d 1023, 503 N.E.2d 1198, *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 501 N.E.2d 207, and *People v. Lambert* (1984), 104 Ill. 2d

375, 472 N.E.2d 427. All those cases are factually distinguishable from the facts of this case. *In re B.J.S.* involved a 12-year-old respondent who was convicted of criminal sexual abuse of his 3-year-old half-sister. A doctor testified that the victim had no hymen intact and her vaginal orifice appeared somewhat larger than that of any other three-year-old child the doctor had examined. The doctor could attribute no significance to the absence of a hymen; she said that the absence of a hymen does not necessarily indicate sexual abuse because it could be caused by strain or excessive play. Similarly, an enlarged vagina did not necessarily indicate sexual abuse because it might have a genetic cause. When asked whether an enlarged vagina would be consistent with sexual activity with the child she examined, the doctor testified, "[I]n light of what the child told me, I felt—yes." (*In re B.J.S.*, 151 Ill. App. 3d at 1025.) The appellate court held that the medical evidence was insufficient.

In *Kokoraleis*, the victim's body was found five months after her abduction. The issue in the case was whether the defendant's confession was sufficient to establish the crime of rape. The only physical evidence related to a possible wound on the left nipple of the victim. A doctor testified that because there was no sign of trauma in that area, the wound could have been caused by chemical and insect composition. There was no medical evidence that a sexual assault had occurred.

In *Lambert*, again the issue was whether there was independent evidence that corroborated the defendant's confession. The defendant was convicted of performing an act of deviate sexual conduct by placing his mouth upon a sex organ of a child. The defendant confessed to having fondled the child's penis and buttock, sucked on the boy's penis and rubbed his penis against the boy's buttock. He denied penetrating the boy's rectum. A police officer testified that he examined the boy at a hospital and noted that the boy's rectum had a light reddish cast. The officer testified that he had no medical training and could not testify if the reddish cast on the boy's rectum was unusual. In reversing the conviction, the supreme court pointedly noted that the "State failed to present medical evidence to establish the possible causes for the condition of the boy's rectum." *Lambert*, 104 Ill. 2d at 380.

We believe that the testimony of Dr. Chambliss constitutes the overriding distinction between this case and the cases cited by the defendant. More in point is a case cited in *Kokoraleis, People v. Darnell* (1981), 94 Ill. App. 3d 830, 419 N.E.2d 384. In *Darnell*, the defendant confessed to the murder and rape of a 10-year-old girl.

When her body was discovered, the girl's shorts were pulled down just below her buttocks. There were red marks on the tip of the defendant's penis that appeared to be abrasions. A pathologist who performed an autopsy found no indications of injury to the victim's genitalia but expressly stated that he could not rule out the possibility of rape. The appellate court held that those facts were sufficient to establish the *corpus delicti* of the crime of rape. In *Kokoraleis*, in distinguishing *Darnell*, the appellate court emphasized the fact that in *Darnell* the victim's shorts were pulled down below her buttocks.

■ In this case, there is the physical evidence of abrasions to the vagina of the victim and the testimony of the pathologist that the lacerations were made just before or shortly after her death. In addition, there is the additional fact that the lower part of the deceased's clothing had been removed and the bizarre fact that flowers had been placed on her buttocks. Finally, we have the opinion evidence of an expert as to the cause of the lacerations. If those lacerations were made just before or shortly after her death, the only reasonable inference is that the lacerations were caused by the person or persons who caused her death.

The defendant alternatively argues that his aggravated criminal sexual assault was not proved because Dr. Chambliss could not establish beyond a reasonable doubt that any sexual assault occurred before death. That argument is analogous to the argument raised in other cases of aggravated criminal sexual assault that the physical injuries which make a sexual assault an aggravated sexual assault must occur before the sexual assault and not after. That argument that subsequent injuries may not be considered has been rejected in *People v. Colley* (1989), 188 Ill. App. 3d 817, 544 N.E.2d 812, in which the court said, "[W]e will not draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward." (*Colley*, 188 Ill. App. 3d at 820.) Similarly, in this case, we will not draw a bright line which would require the State in all similar cases to establish the precise time of death in order to prove a sexual assault upon a murder victim. For these reasons, we conclude that the defendant's guilt of aggravated criminal sexual assault was established beyond a reasonable doubt.

The defendant next maintains that his attorney's misunderstanding of the total number of peremptory challenges available denied or impaired his right to exercise his "full complement of peremptory challenges." The defendant does not expressly maintain that his counsel was ineffective.

The defendant's attorney, after exercising six peremptory challenges and attempting to excuse two more venirepersons, was informed by the trial judge that he had only one peremptory challenge remaining. Apparently, the defendant's attorney was operating under the mistaken assumption that he could exercise 10 peremptory challenges, according to section 115—4(e) of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1989, ch. 38, par. 115—4(e).) It is now conceded that the judge was correct and that the defendant was entitled to seven peremptory challenges under Supreme Court Rule 434(d). 134 Ill. 2d R. 434(d).

■■ The defendant sought to excuse two jurors but was permitted to excuse only one of them. The State subsequently excused the juror the defendant was barred from excusing. Consequently, we agree with the State that the defendant's claim of any reversible error on this point should be rejected on the ground of mootness.

The defendant contends that the introduction of his nickname and any connection to a gang was highly prejudicial. He maintains that Officer Siwak should have been barred from testifying to her encounter with the defendant in 1987 and his use of the nickname "Homicide" at that time. He also maintains that the poem or song or anthem that was contained in his wallet linked him to the Taylor Street Jousters and should not have been admitted.

The issue is whether the evidence of the defendant's nickname and his relationship to a gang was relevant. Where the information is relevant, it is admissible despite the prejudice inuring to the accused from its disclosure. (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 495 N.E.2d 1088.) An accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice attaches to that revelation. *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.

■■ The defendant's nickname was introduced only for the relevant purpose of establishing his identity. The State did not overemphasize the nickname's link to a gang membership nor did the State identify this murder as a gang-related killing. We find that the judge did not err in permitting the State to show the defendant's nickname and that the "anthem" in his wallet proved some connection between the defendant and the Jousters street gang, which was identified in the writings on the garage wall.

The defendant's last contention is that the judge considered improper aggravating factors in sentencing the defendant. Before imposing sentence, the trial judge said the following:

"We have reviewed and heard the facts. We consider them. We consider also the various points set out in the statute, both in aggravation and mitigation. In aggravation we consider the fact that your conduct caused the ultimate harm. Caused death. Taking of a human life. We consider the fact that his action, this conduct was committed upon a person 60 years of age or older. That is an element which we are entitled to consider both in aggravation and for purposes the State has indicated, for extending the term of the possible sentence.

We also consider as it is and we should more properly state in mitigation, consider the fact that you—your history of prior delinquency for an intensive purposes, none. We consider also, the four parts that they talk about when a judge considers sentencing. Punishment, deterrence, rehabilitation, protection of society. And you know, in all cases, I think—well, at least in most cases, there are some one of these four that I have just stated which may outweigh the other three."

Relying on *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, the defendant first contends that it was error to consider the death of the victim in sentencing for murder because the death is implicit in the offense. In *Saldivar* the trial judge found "the primary statutory factor in aggravation 'the terrible harm that was caused to the victim.' " (*Saldivar*, 113 Ill. 2d at 264.) The judge also mentioned that the defendant's conduct caused death and that a human life was taken. In reversing and remanding for resentencing, the supreme court said that the "record demonstrates that the circuit court focused primarily on the end result of the defendant's conduct, *i.e.*, the death of the victim, a factor which is implicit in the offense of voluntary manslaughter." *Saldivar*, 113 Ill. 2d at 272.

■■ A trial judge's statements at sentencing may not be considered in isolation. (*People v. McGlasson* (1991), 219 Ill. App. 3d 252, 579 N.E.2d 1120.) When viewed as a whole, the trial judge's statements suggest that he was articulating, in a summary fashion, the relevant facts considered in determining the appropriate sentences. It may not be said that he focused primarily on the fact that the defendant's conduct caused the death of the deceased. In this regard, this case is distinguishable from *Saldivar*.

The defendant also argues that the trial judge improperly considered the victim's age as an aggravating factor in sentencing him for aggravated criminal sexual assault. The defendant is correct in

pointing out that a judge may not consider the age factor in imposing a sentence when it is an element of the offense. (*People v. Ferguson* (1989), 132 Ill. 2d 86, 547 N.E.2d 429.) The defendant's argument assumes that the deceased's age was considered in aggravation only for the sentence for aggravated criminal sexual assault. That is an assumption that we cannot accept. In fact, the record is to the contrary. The victim's age may properly be considered in determining whether a defendant shall receive an extended sentence. Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(4)(ii).

Finally, even if we were to assume that improper factors were considered in aggravation, reliance on an improper factor does not always necessitate remandment for sentencing. Where it may be determined from the record that the weight placed on an improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. (*People v. White* (1986), 114 Ill. 2d 61, 499 N.E.2d 467.) We note that the trial judge rejected the State's recommendation that the defendant be sentenced to a term of natural life imprisonment and sentenced the defendant to terms within the statutory range. In our judgment he did not abuse his discretion in imposing sentence.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and GIANNIS, J., concur.