THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVE JONES *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—91—1443, 1—91—3089 cons.

Opinion filed March 31, 1994.

Rita A. Fry, Public Defender, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant Steve Jones.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant Perry Lewis.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eileen Rubin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a joint jury trial, defendants Steve Jones and Perry Lewis were convicted of first degree murder and two counts of

attempted first degree murder (720 ILCS 5/9—1, 8—4 (West 1992)). In their consolidated appeal, defendants argue that: (1) the trial court improperly admitted evidence of defendants' gang affiliation; and (2) the State improperly introduced evidence of threats made to an eyewitness.

We affirm.

## BACKGROUND

On December 9, 1989, at approximately 3 a.m., a shooting occurred at the Night Owl Motorcycle Club located at 643 North Kedzie, Chicago Illinois. One of the doormen, John Redmond, was killed, and two patrons, Dora Keys and Odes Jackson, were wounded.

George Horton testified that he was the president of the Night Owl Motorcycle Club. He explained that the club was open to the public on Fridays and some Saturdays, but all persons who were not motorcycle club members were searched at the door. He also stated that individuals were allowed to wear hats in the club, but they were required to wear their hats straight, as opposed to crooked or backwards. Horton testified that he was familiar with the neighborhood where the club was located and knew that the Vice Lords street gang members wore their hats to the left.

Horton described the entrance to the club as follows. The front door of the club opened outward toward the street and led to the front hallway. At the end of the front hallway, there was another door, followed by a second hallway which led to the main bar area.

On December 8, 1989, Horton arrived at the club between 10 and 11 p.m. He testified that Tracy O'Neal (O'Neal), John Redmond (Redmond) and a few others were working the door area that night. Redmond was responsible for searching people at the door as they entered the club. At approximately 2:15 a.m., Horton saw Redmond and defendant Jones exchanging words in the front hallway, but he was unable to hear what was said. About 45 minutes later, Horton heard shooting, and he ran to the hallway. When he reached the front, he observed Redmond and Odes Johnson lying on the floor.

On cross-examination, Horton stated that when he was questioned on December 9, 1989, by two detectives, he did not mention the altercation that had occurred at the door between Jones and Redmond. Horton first told the officers about the altercation a few days later, after he identified Jones from a photo array. Horton did not recall whether Redmond was armed on the night of the shooting.

O'Neal testified that on December 8, 1989, he was working at the Night Owl Motorcycle Club from 11 p.m. until closing time. At about 3 a.m. O'Neal was working the door. While he was standing in the

second doorway and looking toward the front door, he observed a woman enter the club and a second person come to the front door. He then heard the door slam and observed Redmond and a woman standing near the front door. The front door opened again and the shooting began. O'Neal observed defendant Lewis firing a small revolver and defendant Jones firing a medium-sized shotgun into the hallway of the club.

O'Neal lives in the same neighborhood as defendants and he has known both of them since grammar school. O'Neal testified that defendants were not motorcycle club members; instead, they wore their hats to the left, which means that they were members of the Vice Lords street gang. O'Neal saw other Vice Lords street gang members in the club that evening. Minutes before the shooting, O'Neal observed nonmembers leaving the club. On cross-examination, O'Neal stated that after the shooting he was in the office of the club and did not talk to police officers at that time. It was not until several days after the incident that he told the police what he had observed.

Edward Keys testified that on December 9, 1989, at about 1 a.m., he went to the Night Owl Motorcycle Club with his wife, Dora. He was not a member of the Night Owl Motorcycle Club, but he was a member of the Chicago Guy Hawks Motorcycle Club. At approximately 2:45 a.m., he and Dora were ready to leave the club. As Dora walked outside, Keys stopped to talk to a club member. Following the conversation, he went to the door to tell Dora to come back inside. At that time, he observed Redmond and Jones arguing at the door. Redmond was prohibiting Jones from reentering the club. Keys observed that Redmond was holding a two-barrel derringer which was pointed down toward the floor. As Dora started to come back inside, someone told him to "hit the floor" and he heard a shotgun blast and pistol shots. Keys saw Redmond fall backwards. Dora was crawling toward him and telling him that she had been shot. He saw that her right ear was bleeding and swelling. Keys observed Jones holding a shotgun.

Keys conceded that the police never asked him to view a lineup or photo array, and that he saw Jones in court on the Monday prior to trial. However, this was not the first time he told anyone that Jones was the same individual in the bar that night with a shotgun; Keys testified that he had previously told defense counsel, the police, and the state's attorney that Jones was at the scene of the crime with a shotgun.

Dora testified that on December 9, 1989, around 1 a.m., she went to the Night Owl Motorcycle Club with her husband. She stated that

after they decided to leave she went out the door to the sidewalk where she observed a disturbance. She stayed outside for a while because the doorman would not let her back in until her husband came and got her. As Dora was going back inside, she heard someone say, "hit the floor." Dora heard shooting and then felt a bullet hit her in the right ear. After the police arrived, she was taken to Cook County Hospital, where she received medical treatment.

Dr. Edmond Donoghue testified that on December 10, 1989, he performed an autopsy on Redmond, and it was his opinion that Redmond died from multiple gunshot wounds.

Odes Jackson testified that he was a member of the Night Owls Motorcycle Club prior to December 9, 1989. He went to the club at around midnight on December 9 and decided to leave sometime between 2:30 and 3 a.m. Upon reaching the front door, he saw Redmond, who appeared to be "kind of mad." A man whom Redmond had previously put out of the club was also at the door. Jackson did not leave right away because Redmond asked him to handle the door. Jackson let a man out and a woman in. When Jackson tried to pull the door shut, someone snatched the door open and started shooting. Jackson fell back, hit the floor, and felt a burning sensation in his leg. He had suffered two gunshot wounds to his leg.

Antonio Murray testified that on December 9, 1989, at approximately 2:50 a.m., he was standing on the front porch of 620 N. Kedzie, which is located across the street and about five houses away from the Night Owl Motorcycle Club. At that time Murray, a member of the motorcycle club, saw a gang of people standing in front of the club making a lot of noise and arguing. Murray then observed defendant Lewis emerge from the Night Owl and run southbound on Kedzie toward Ohio Street. Lewis passed right in front of Murray. Murray had known Lewis for seven or eight years from the neighborhood and he knew Lewis to be a member of the Vice Lords street gang. Murray testified that Lewis wears his hat to the left the way the Vice Lords wear their hats in the neighborhood. About two to three seconds later, Murray observed Lewis running back towards the Night Owl holding his jacket like he had something underneath it. After Lewis returned to the Night Owl, Murray heard hollering coming from the club and specifically heard: "All Vice Lords leave." Murray then saw people running out of the club and heard gunshots which sounded like a gun and a shotgun. After hearing the shots fired, Murray saw Lewis running back south toward Ohio, passing in front of him again.

Murray also saw a green Oldsmobile with a beige top pull up in front of the club. He observed two men dragging somebody toward

the car and another person trying to get in on the opposite side. Before the person could get in, the car drove off. Murray then saw that same person, whom he identified as Jones, run past him down Kedzie toward Ohio. Jones was carrying a shotgun and Murray could see eight to nine inches of the double-barrel shotgun; the rest of the gun was covered by Jones' jacket.

Murray testified that the group of people that he had observed in front of the motorcycle club were wearing their hats to left, but they were not people that he knew from the neighborhood. He also stated that the people who came running out of the club after someone yelled "All Vice Lords leave" were wearing their hats to the left.

On September 14, 1989, Murray went to the police station and identified Jones in a lineup. While at the police station, Murray also identified Lewis from a photo array.

Officer Frances Higgins testified that on December 13, 1989, he arrested Jones and turned him over to two gang crimes officers. Officer Howard Butvill testified that he was a Gang Crimes West officer, specializing in monitoring gangs and gathering information on gangs. On December 15, 1989, Butvill received a call from Reverend Butler, and in response to that call, Butvill and his partner went to Reverend Butler's church at 321 N. Pulaski, where Lewis presented himself to the police.

Following a joint jury trial, Jones and Lewis were convicted of first degree murder and two counts of attempted first degree murder. Jones was sentenced to a term of 36 years' imprisonment for the charge of first degree murder, to run concurrently with a term of 30 years for both counts of attempted first degree murder. Lewis was sentenced to a term of 44 years' imprisonment for the charge of first degree murder, to run concurrently with a term of 30 years for both counts of attempted murder. Both Jones and Lewis appealed, and their appeals have been consolidated.

OPINION

I

■ Defendants first contend that the trial court improperly admitted evidence of their gang affiliation, thereby depriving them of a fair trial.

Prior to trial, defendants brought a motion *in limine* to bar admission of any evidence tending to show gang affiliation. The State informed the court that defendants' gang affiliation would be presented to show motive for the crime. On this basis the trial court denied defendants' motion.

After the State rested, the defense moved for a mistrial on the ground that the State had not presented any evidence demonstrating that the motive for the shooting had been gang related. Defense counsel argued that the only apparent motive for the shooting was the doorman's refusal to readmit Jones to the club. Therefore, defense counsel argued that the evidence regarding gang affiliation was irrelevant and introduced solely for the purpose of inflaming the jury.

After carefully weighing the probative value of the evidence against the potential prejudicial effect, the trial court denied the motion. In doing so, the court made the following findings:

> "[The] probative value outweighs the prejudice ***. Here the evidence was adduced to prove motive, common purpose, and design. I think there is no question that *** unlike *Smith*, one of these defendants was involved in an altercation with the doorman. The evidence concerning that was brief. But it is evidence in this trial. And there was further evidence that the defendants acting together and with others fired shots into the motorcycle [club], after Jones had had an altercation with the person working at the door *** [who] was the apparent victim.
>
> I think the nexus has been proved and the probative value outweighs the prejudice *** against gang membership."

Evidence indicating that the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*People v. Smith* (1990), 141 Ill. 2d 40, 58.) However, such evidence is only admissible where there is sufficient proof that such membership or activity is related to the crime charged. (*Smith*, 141 Ill. 2d at 58.) It is the function of the trial court to weigh the probative value and the prejudicial effect of evidence in determining whether it should be admitted, and evidentiary rulings of this nature will not be overturned absent a clear abuse of discretion. *People v. Gonzalez* (1991), 142 Ill. 2d 481, 489.

Defendants contend that there was no indication that gang affiliation was the reason for the shooting. Defendants argue that none of the State's witnesses indicated that the motive for the shooting was anything other than Jones' anger at Redmond's refusal to readmit him to the club. Defendants further assert that the State presented no evidence of animosity between the motorcycle club members and the Vice Lords. On the contrary, the Vice Lords and the motorcycle club members were socializing together. Therefore, defendants maintain that the supreme court's decision in *Smith* (141 Ill. 2d 40) mandates reversal of this case.

In *Smith*, the victim was an assistant warden at the Pontiac Correctional Center. As proof of motive, the trial court allowed the

State to elicit testimony from another assistant warden which indicated that the victim had had an altercation with the leader of the gang to which Smith allegedly belonged, there was gang activity in the prison, and the victim was a strict disciplinarian who refused to tolerate any gang-related activity. *Smith*, 141 Ill. 2d at 52.

The supreme court held that the gang-related evidence might have been probative of whether Smith had a motive to kill the warden if it had somehow been tied to Smith. (*Smith*, 141 Ill. 2d at 58-59.) However, the evidence only indicated that Smith had been seen in an apartment on one occasion with the leader of the King Cobras, Smith was talking with the gang leader at the time of his arrest, and the gang leader was influential in the neighborhood. (*Smith*, 141 Ill. 2d at 59.) The court held that this evidence, by itself, could not support a reasonable inference that Smith was an active member of the King Cobras, or that he was acting pursuant to the alleged orders of the gang leader. (*Smith*, 141 Ill. 2d at 59.) The court further found that there was no evidence to suggest that Smith knew that the victim was an assistant warden, was tough on gangs, or had an altercation in prison with the gang's leader. (*Smith*, 141 Ill. 2d at 59.) The court concluded that the gang-related evidence was of little probative value, stating that "[i]t goes too far to suggest that every person somehow associated with [the leader of the King Cobras] is a member of the King Cobras, and thereby subject to the will of [the gang leader] and shares a common design or purpose with the gang." *Smith*, 141 Ill. 2d at 59-60.

We find that *Smith* is distinguishable from the case at bar. First, in the instant case, unlike *Smith*, there was direct testimony indicating that defendants belonged to a gang. O'Neal testified that he had known both defendants since grammar school and he knew them to be members of the Vice Lords street gang. Murray testified that he had known Lewis from the neighborhood for seven or eight years and he knew Lewis to be a member of the Vice Lords. Second, the gang-related evidence in this case tended to show that defendants were acting together and engaged in a common purpose and design. Horton and Keys testified that defendant Jones had an altercation with Redmond, the doorman, shortly before the shooting began. Next, Murray observed defendant Lewis running first from the motorcycle club and then back to the club while holding something under his jacket. After Lewis returned, Murray heard someone yell, "All Vice Lords leave," and people began running from the club. Finally, O'Neal testified that he saw both Jones and Lewis shooting into the entrance of the club.

We do not agree with defendants' contention that the entire shooting incident can be explained solely by reference to the prior

altercation between Jones and Redmond and, therefore, the gang evidence was irrelevant. Jones' actions were interwoven with those of Lewis. The fact that Lewis joined Jones in shooting members of the motorcycle club can be explained by the fact that Jones and Lewis belong to the same gang. Furthermore, Jones and Lewis did not merely shoot Redmond, but instead opened fire on others inside the motorcycle club. We conclude that the evidence of gang affiliation was relevant to explain defendants' conduct and, therefore, the trial court did not abuse its discretion by admitting this evidence.

## II

•2 Defendants next contend that they were denied a fair trial because the State improperly elicited testimony from an eyewitness that suggested that the witness had been threatened. Defendants assert that the testimony was improper because the State failed to prove any connection between the threat and the defendants.

On direct examination, the State engaged in the following exchange with O'Neal:

"Q. After you talked to the police about this case did anyone come and see you about this case?

A. Yes, they did.

Q. Do you know who those people were?

A. Yes, I do.

Q. Have you ever met them before?

A. Yes, I have.

Q. Who were they?

A. Some guys around the neighborhood.

Q. Were they wearing hats on that day?

Ms. White: Objection.

Mr. Mulane: Sidebar, judge."

During the sidebar, defendants moved for a mistrial for two reasons: the alleged threat had not been disclosed to the defense prior to trial; and O'Neal's testimony suggested that the people who visited him were Vice Lords and thereby connected to the defendant when there was no evidence to support that suggestion. The trial court denied the motion, concluding that because the question was never answered, and a prompt objection was made, the error could be cured. The trial court noted that no testimony had been adduced concerning alleged prior threats or the angles of the hats. Upon returning to the courtroom, the trial judge instructed the jury as follows:

"I admonish you to disregard the last question asked by the prosecutor to the witness, O'Neal, concerning being visited in the neighborhood by persons after this incident.

It is to be stricken from the record and disregarded by the jury."

Defendants correctly assert that evidence regarding threats is inadmissible absent proof that the threats were related to the charges against the defendant. (See *Smith*, 141 Ill. 2d at 67.) In this case, however, the trial court sustained an immediate objection to the State's questions because the State failed to give notice of the alleged threats to defense counsel. Since the State's line of questioning was cut off so quickly, it is unclear whether the State would have been able to demonstrate a sufficient nexus between the alleged threats and defendants. By the same token, however, we conclude that the immediate termination of this line of questioning prevented any prejudice from enuring to defendants.

When a timely objection is made at trial, the court can usually correct the error by sustaining the objection or instructing the jury to disregard the answer or remark. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 178; *People v. Flores* (1993), 256 Ill. App. 3d 484, 495.) Assuming *arguendo* that sustaining the objection did not cure the error in this case, the error was harmless. " 'Error may be harmless because the error itself is inconsequential or, if the error is of a more serious nature, it may be deemed harmless when balanced against the strength of the State's evidence.' " *Flores*, 256 Ill. App. 3d at 495, quoting *People v. Glover-El* (1981), 102 Ill. App. 3d 535, 541.

In the instant case, Horton and Keys testified that, prior to the shooting, Jones was arguing with one of the victims at the door of the motorcycle club. Next, Murray, who was standing across the street, testified that after hearing argument from the club, he observed Lewis run past him and then return to the motorcycle club holding his jacket as if he had something inside. Shortly thereafter, Murray heard gunshots which sounded like both a gun and a shotgun. O'Neal, who was inside the club, testified that he witnessed the shooting. He stated that defendant Jones fired a medium-sized shotgun at the victims inside the motorcycle club, and defendant Lewis fired a small revolver at the victims. Finally, Murray saw Lewis run from the club first, and then moments later, he saw Jones run past him carrying a partially concealed shotgun. In light of the overwhelming evidence of defendants' guilt, we conclude that the error, if any, was harmless.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GORDON and McNULTY, JJ., concur.