THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ENOCH WILDER, Defendant-Appellant.

First District (5th Division)    No. 1—99—1425

Opinion filed October 12, 2001.

988

THEIS, J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (Thomas F. Finegan, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Enoch Wilder (Wilder) was found guilty of first degree murder, armed robbery, and aggravated kidnaping after a jury trial. The court sentenced him to an aggregate 60-year sentence: 45 years for first degree murder, 15 years for armed robbery and 15 years for aggravated kidnaping, with the 15-year sentences concurrent to each other and consecutive to the 45-year sentence. Defendant filed a motion for a new trial and a motion to reconsider his sentence. Both motions were denied and this appeal followed. For the reasons that follow, we affirm in part and vacate in part.[1]

Prior to the start of the *voir dire*, defense counsel advised the court that there had been difficulty in obtaining proper trial clothing for the 450-pound defendant. He stated that the defendant's brother had intended to purchase clothes for the defendant, but lacked the funds to do so. Defense counsel requested a 30-day continuance to enable the defendant to obtain presentable clothing for trial. The prosecutor then suggested that the investigators from the public defender's office could purchase clothing for the defendant. However, the judge noted that the case had been previously set for trial and that the clothing situation should have been resolved earlier. Accordingly, he denied defendant's motion. The defense attorney then responded that it was unconstitutional to have the defendant sit in front of a jury in a torn Department of Corrections outfit. The court reiterated that the clothing situation had not arisen unexpectedly and that it was something that defendant had over three years to resolve. The jury selection then began.

At the conclusion of the *voir dire*, the defense objected that the defendant's mention of gang affiliation in his court-reported confession was prejudicial and inflammatory since the case did not involve gang membership. The confession given to Assistant State's Attorney Stephen DiNolfo read in pertinent part:

"Q. Are you in any gang?

A. Yes.

Q. What gang are you in?

A. Vice Lord.

---

[1]On June 29, 2001, the Illinois Supreme Court vacated our previous opinion in *People v. Wilder*, 321 Ill. App. 3d 608 (2001) *vacated*, 195 Ill. 2d 596 (2001), with directions to reconsider our ruling in light of the supreme court's subsequent decision in *People v. Wagener*, 196 Ill. 2d 269 (2001). We now proceed under that directive.

Q. And how long have you been a Vice Lord?
A. 15 years.
Q. Do you have a nickname?
A. Yes.
Q. What is your nickname?
A. Big Murder or Woo."

The statement then described defendant's activity on the night of November 3, 1995. During that recitation, DiNolfo directed the defendant's attention to the gang memberships of the other individuals who participated in the incident:

"Q. Do you know if Nose is in a gang?
A. Yes.
Q. What gang is he in?
A. Chief of Mafia Vice Lord.
Q. What about Sko?
A. He is Mafia Vice Lord.
Q. And Antoine?
A. Mafia Vice Lord.
Q. What about Butter?
A. Unknown Vice Lord."

The court found that since the information about defendant's gang membership came from the defendant's statement and not from a third party, the defense was essentially asking the court to order the State to redact defendant's own statement. Accordingly, the court ruled that defendant's entire statement was admissible and that the State would not have to remove any of the gang references made by defendant therein.

Before the start of trial on the next day, the defendant, now dressed in civilian clothing, renewed his objection to the fact that the jury observed the defendant in prison clothing on the previous day and asked the court to dismiss the panel. The court indicated that while defendant requested a 30-day extension to obtain new clothing, no one had asked for a one-day continuance—something to which the court may have been more amenable. The court also reiterated that the defendant had ample opportunity to have proper clothing purchased for him due to the extensive period of time that the case was pending. Accordingly, the court denied defendant's renewed objection as well as his motion for a new trial.

At trial, a number of witnesses were called to relate the events of November 3, 1995. On that night, at 1420 S. Avers in Chicago, Robbie Barrett was killed by a gunshot wound to the back of the neck. Behind the home at that address, Jimmie Johnson operated a mechanic's garage where his brother, Robert Johnson, and Winorva Nichols worked as mechanics. The three were also involved in the sale of rock cocaine

out of the garage. After returning home from dinner that evening, Robert Johnson found a man known as "Jamaica" waiting for him by the garage with the defendant in a burgundy Cadillac. Jamaica had spoken with Jimmie Johnson on November 2, 1995, about borrowing a battery. He had spoken to Winorva earlier that day about it, but was told that he needed to speak with Robert Johnson. When Jamaica finally spoke to Robert that night, he told him that he needed to borrow the battery to get his van running in order to bring some tools to the garage. Robert told Jamaica that the only battery he had was being charged for the car he was selling to Robbie Barrett.

Afterward, defendant and Jamaica went to "Theresa's" house where they met with Butter, Nose, Antoine, and Sko. Nose stated that he wanted to commit a robbery that night and Jamaica stated that he knew of a place to rob. The defendant, Jamaica, Nose, Antoine, Butter, and Sko then armed themselves and got into the van Jamaica was driving.

At approximately 11 p.m., Robert Johnson and Winorva Nichols were in the alley behind 1420 S. Avers working on cars when a tan van pulled up to the garage and trapped Robert and Winorva between the cars they were repairing. Three armed people exited the van wearing ski masks. The three told Robert Johnson and Winorva Nichols to go inside the garage and demanded all of their money and drugs. Between $20 and $60 was taken from Robert Johnson along with two or three bags of rock cocaine. The men took $65 and four or five rocks of cocaine from Winorva Nichols.

Also around that time, Robbie Barrett flagged Jimmie Johnson down in his tow truck to buy a car which he had earlier discussed with Jimmie. Robbie Barrett went home to get the $425 for the car, and when he returned, exchanged the money for the title with Jimmie. Robert Johnson, who was lying down in the garage at that point, stated that he heard one man enter the garage, whisper to one of the other offenders, and then leave the garage. They returned with Robbie Barrett. After a brief struggle, one of them shot Robbie. The offenders then opened the garage door and ran to the van, which departed the scene.

According to defendant's confession, when the van pulled up to the garage, there was a man in the alley. Nose then told them to "take care of business," and Antoine, Sko, and Butter all got out of the van with guns. Nose spotted Robbie Barrett walking around to the garage and told defendant to go "get him." After defendant shoved Barrett in the direction of Sko, they frisked Barrett and retrieved some money. They then ordered Robbie Barrett to lie on the ground, which he did next to Butter. According to defendant, Butter said nothing and shot

Robbie Barrett in the back of the head. The men then jumped into the van and pulled away. Later that night, Nose divided the proceeds, and defendant received $20 and a blow of heroin.

After trial, the defendant was found guilty of the armed robbery of Winorva Nichols, the armed robbery of Robert Johnson, the aggravated kidnaping of Robbie Barrett, and the first degree murder of Robbie Barrett and was sentenced to an aggregate of 60 years: 45 for first degree murder and 15 years each for armed robbery and aggravated kidnaping. The 15-year sentences were ordered to be served concurrent to one another and consecutive to the 45-year sentence. In giving that sentence, the court took notice of a previous conviction of armed robbery, the defendant's conduct on November 3, 1995, and his involvement in an armed robbery which occurred on November 7, 1995. Accordingly, the judge determined that consecutive sentences were appropriate to protect the public from further criminal conduct by the defendant. Defendant moved for a new trial, again arguing the issue of defendant's clothing. That motion was denied, and defendant now appeals.

Defendant's first argument is that his conviction should be reversed and the cause remanded for a new trial because evidence of his gang membership was unfairly and prejudicially injected into the trial. Before trial, the defense argued that the defendant's reference to his street gang affiliation in his confession should be excluded as prejudicial and irrelevant because it had nothing to do with the facts of the case. The judge disagreed and stated that it was relevant to the manner in which the crimes were committed.

■ The standard of review for evidentiary rulings on gang-related evidence is an abuse of discretion standard. *People v. Gonzalez*, 142 Ill. 2d 481, 489-90 (1991). "[E]vidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act." *People v. Smith*, 141 Ill. 2d 40, 58 (1990). However, evidence of gang membership "is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Smith*, 141 Ill. 2d at 58. Where there is such paucity of evidence that an offense was gang related, introduction of gang evidence at trial constitutes reversible error. *People v. Goldsberry*, 259 Ill. App. 3d 11 (1994). As with other evidence, gang membership evidence is admissible only if relevant to an issue in dispute and where its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 159 Ill. 2d 97, 118 (1994). "An accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice at-

taches to that revelation." *People v. Hendrix*, 250 Ill. App. 3d 88, 104 (1993), citing *Gonzalez*, 142 Ill. 2d 481.

Defendant claims that the offenses in this case were fairly straightforward, without any gang implications or nuances, as they were all committed with one objective in mind: to steal money and drugs. Further, defendant claims that with regard to the contention that Nose, a chief of the Mafia Vice Lords, had orchestrated the robbery and the ensuing events, such similarity in gang affiliation "was merely incidental to the incident." He claims that such an affiliation "had no bearing on the planning or carrying out of the incident," as there was no correlation between the group's actions that night and gang membership. In fact, because Nose never invoked any gang authority or hierarchy in directing the group's actions, it was just as likely that his criminal knowledge and planning skills were responsible for his direction of the participants. Likewise, he continues, if "several members of a high school football team were to burglarize a clothing store it would not be accurate to describe their activity as sport related or school related."

The State responds that the court did not abuse its discretion in allowing defendant's statement that he was a member of the Vice Lords street gang, that information being relevant to the charges against the defendant. Among the individuals defendant was with prior to the armed robbery and murder was Nose, who defendant stated was the chief of the Mafia Vice Lords. Sko and Antoine, like Nose, were members of the Mafia Vice Lords, and Butter was a member of the Unknown Vice Lords. According to defendant's court-reported statement, Nose told defendant, Jamaica, and others that they needed to "go hit a lick" or hold someone up. After Nose made this demand, Jamaica said he knew of a place to go. Once they arrived, Nose instructed Sko, Antoine, and Butter to "go take care of business," meaning to hold them up. Moreover, once Robbie Barrett approached the garage, it was Nose who instructed defendant to get him. Defendant followed instructions and took Barrett into the garage. After the group left the scene, they returned to the house where the crime was planned and Nose divided up the proceeds of the robbery.

■ While the special concurring opinion would like us to believe that it is Nose's leadership qualities that allow him to seemingly give all of the orders and make all of the major decisions, it is a reasonable inference that it is his role as chief of the Mafia Vice Lords that allows him to (i) decide that it is time to rob someone; (ii) instruct the group that he approved the site of the robbery; (iii) direct the defendant to go after the victim; and finally (iv) to be the person who takes the loot and thereafter divides it among the participants.

The special concurrence concludes that because the gang-related evidence does not link these crimes from the perpetrators to the victims, the trial court erred in admitting this evidence. We agree that evidence of a defendant's gang affiliation, by itself, should not be used to establish the relationship of a gang motive to the crime charged, as such evidence then has great potential to result in an automatic assumption of guilt arising from the deep and widespread public prejudice against street gangs. On the other hand, we also believe that a defendant need not commit a crime typically thought of as gang-related— such as a drive-by shooting—for it to be gang-motivated. Indeed, gang members plan and engage in countless criminal acts where the fact of their membership may not be evident from the commission of the crime, yet is readily evident from and connected to the crime's planning and motivation. We believe such an instance exists here.

As previously stated, gang-related evidence "is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Smith*, 141 Ill. 2d at 58. In this case, defendant's confession relates the following sequence of events: Defendant and Jamaica met Butter, Nose, Antoine and Sko, all of whom were somehow affiliated with the Vice Lords, at Theresa's house. Nose, whom defendant recognized as chief of the Mafia Vice Lords, stated that he wanted to commit a robbery. Once they arrived at the garage, Nose told the group to "take care of business." Nose then spotted Barrett walking around the garage and told defendant to go "get him." After the crimes were committed and the perpetrators fled the scene, Nose divided the proceeds among them. We read this confession as stating that Nose exercised his gang leadership authority in organizing and planning the robbery; directing all participants once they arrived upon the scene; specifically directing defendant to get Barrett; and finally, dividing the proceeds once the crime had been committed. In other words, defendant's confession made evident the existence of a gang hierarchy in that one individual directed the commission of this crime.

"The testimony regarding gang hierarchy is relevant and admissible to explain an otherwise inexplicable act and to establish a motive for the [crime], *i.e.*—advancement within the ranks." *People v. Davenport*, 301 Ill. App. 3d 143, 151 (1998). In truth, were defendant and his confederates to refuse to comply with Nose's bidding, it would have likely resulted in more troublesome consequences for them than if they had refused a peer who was not chief of the Mafia Vice Lords. Consequently, we find the trial court's holding that the gang-related evidence related to the crime to be entirely reasonable. Because this court is to reverse only when no reasonable person could adopt the

view taken by the lower court (*In re Marriage of Getautas*, 189 Ill. App. 3d 148, 153 (1989)), we affirm the trial court's decision to allow the evidence as relevant.

■ Defendant's next argument is that his conviction should be reversed and the cause remanded because he appeared in jail clothing during the jury selection process. For this, he argues that courts have traditionally recognized the potential harm which results from requiring a defendant to appear in jail clothing at a jury trial. *Estelle v. Williams*, 425 U.S. 501, 504-05, 48 L. Ed. 2d 126, 130-31, 96 S. Ct. 1691, 1693 (1976). Furthermore, it may be error when a defendant is required to appear in jail garb before a jury when a brief continuance would have allowed the defendant to obtain proper clothing and thus avoid the stigma of appearing in jail clothing. *People v. Steinmetz*, 287 Ill. App. 3d 1, 6-7 (1997). The standard of review for the issue of the granting of a continuance is whether the trial court abused its discretion in ruling on the requested continuance. *People v. Rodgers*, 288 Ill. App. 3d 167, 171-72 (1997).

Admittedly, defendant is not questioning the court's denial of his request for a 30-day continuance and states, "[c]learly such an extended period of a continuance was not warranted at that stage of the proceedings." What he does question, however, is the court's failure to resolve the issue by ordering a one-day continuance. Again, he admits that while he never specifically asked for a one-day continuance, "the judge should have used his discretion and he should have given the defense a brief opportunity to acquire proper clothing for the defendant." Such an oversight, he claims, amounts to an abuse of the court's discretion.

■ The State correctly responds that the issue of whether the trial court should have granted a one-day continuance is not properly before this court, since defendant never requested such a continuance. Moreover, to require the trial court to grant, *sua sponte*, a continuance for a period of time not requested is beyond the duty of the court and shifts the duties of the defense attorney to the trial judge. The State quotes *Estelle* for this proposition:

> "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made *** during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." *Estelle*, 425 U.S. at 512, 48 L. Ed. 2d at 135, 96 S. Ct. at 1697.

Because defendant only made his request for a 30-day continuance, the issue of whether the court should have granted a one-day continuance is beyond this court's review.

However, assuming that the court considered granting the one-day continuance to defendant *sua sponte* and still refused, a continuance does not seem required under *Steinmetz* and *Estelle* given the facts of this case. As previously noted, the grant or denial of a motion for continuance is at the sound discretion of the trial court. *People v. Gosier*, 145 Ill. 2d 127, 157 (1991). And under *Estelle*, the State cannot compel a defendant to stand trial before a jury while dressed in identifiable prison clothing. *Estelle*, 425 U.S. at 504, 48 L. Ed. 2d at 130, 96 S. Ct. at 1693 (adopted by this court in *People v. Wilkes*, 108 Ill. App. 3d 460 (1982)). However, "where a defendant has ample opportunity to secure civilian clothing and then appears in court wearing jail attire, he cannot claim denial of a fair trial." *People v. Partee*, 157 Ill. App. 3d 231, 253 (1987), citing *People v. Medley*, 111 Ill. App. 3d 444, 448 (1983).

Here, as the court points out, defendant had ample time (three years) to acquire civilian clothing before his trial date and was able to do so on the second day of trial. Moreover, the trial transcript reflects that defendant's case was set for trial two times before February 8, 1999: November of 1997 and December of 1997. This is quite unlike the facts in *Steinmetz*. There, the defendant's attorney had contacted the jail twice to ensure that the defendant was taken to court in civilian clothes. However, defendant was still taken to court in his jail attire. *Steinmetz*, 287 Ill. App. 3d at 6. In other words, unlike the case at bar, the defendant in *Steinmetz* made a genuine effort to secure appropriate clothing for trial. Here, defendant told his attorney that he would handle it, proceeded to wait for his brother who had insufficient funds, and then moved for a 30-day continuance. In addition, showing up to court on the next day in civilian clothes belies his assertion that such a motion was anything other than a delaying tactic. Consequently, we find that the trial court did not abuse its discretion for failing to order a one-day continuance, where such a motion was never properly before the trial court and the facts of the case do not summarily support a grant of the motion even if it was.

Defendant's last argument is that the trial court improperly imposed consecutive sentences under section 5—8—4(b) of the Unified Code of Corrections (730 ILCS 5/5—8—4(b) (West 1998)). While the defendant's motion to reconsider the sentence did not challenge the imposition of consecutive sentences on this ground, the imposition of a sentence not authorized by the statute is void and it may be challenged at any time. *People v. Arna*, 168 Ill. 2d 107, 113 (1995). Accordingly, we choose to consider this issue. At the time of the instant offenses, section 5—8—4 provided in pertinent part:

"(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct

during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was [first degree murder or] a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 [(criminal sexual assault)] or 12—14 [(aggravated criminal sexual assault)] of the Criminal Code of 1961 [(720 ILCS 5/12—13 or 12—14 (West 1994))], in which event the court shall enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court.

(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5—8—4(a), (b) (West 1994).

Section 5—8—4(b) was later amended, effective July 22, 1997. The 1997 amendment mandated consecutive sentencing under subsection (b) for offenses not committed as part of a single course of conduct that meet any of the same exceptions listed in subsection (a), *e.g.*, the defendant is charged with a Class X or Class 1 felony and the defendant inflicted severe bodily injury during the course of that felony. 730 ILCS 5/5—8—4(b) (West 1998). We remark on this not because it is applicable to the facts of the case before us. Rather, we simply feel that an analysis of that amendment, in particular, and the case law interpreting it is beneficial to our understanding of the statute. Later in this opinion, we set out a more comprehensive summarization of the other amendments to this section and the corresponding case law.

Arguing that he was improperly sentenced, defendant points to *People v. Porter*, 277 Ill. App. 3d 194, 198 (1995), where this court stated:

"[Section 5—8—4(b)] has been interpreted as applying only where the multiple convictions do not arise out of a single course of conduct. (*People v. Cooper* (1992), 239 Ill. App. 3d 336, 360, 606 N.E.2d 705.) Where, as here, the convictions arise out of a single course of conduct during which there was no substantial change in the criminal objective, the trial court's authority to impose consecutive rather than concurrent sentences is determined by section 5—8—4(a) of the Unified Code of Corrections. 730 ILCS 5/5—8—4(a) (West 1992)."

Defendant's argument is that the offenses of which he was convicted arose out of a single course of conduct in which there was no substantial change in the nature of the criminal objective, and consequently, he cannot be sentenced under section 5—8—4(b).

In our previous opinion, *People v. Wilder*, 321 Ill. App. 3d 608 (2001), *vacated*, 195 Ill. 2d 596 (2001), we did not reach defendant's substantive argument. Under our previous interpretation of the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), we held that section 5—8—4(b) unconstitutionally increased defendant's sentence. However, on June 29, 2001, the Illinois Supreme Court vacated our previous opinion in *Wilder*, with directions to reconsider our ruling in light of the supreme court's subsequent decision in *People v. Wagener*, 196 Ill. 2d 269 (2001), which found that consecutive sentencing did not violate the prescripts of *Apprendi*. Accordingly, we now consider the merits of defendant's argument.

The gist of defendant's claim is that when subsection (a) is read together with subsection (b), the plain and ordinary meaning of these two sections is that consecutive sentences under subsection (a) can only be imposed on offenses where any of the exceptions of that subsection apply and the offenses occurred in a single course of conduct. See *People v. Bole*, 155 Ill. 2d 188, 197 (1993) (holding that where the offenses are committed in separate courses of conduct, subsection (a) is inapplicable). Accordingly, he argues, if a court seeks to impose consecutive sentences in a situation where the criminal objective has changed and the offenses are committed in separate courses of conduct, the only vehicle that may be used to accomplish that task is subsection (b).

Such an interpretation, we think, is supported by language from the supreme court in *People v. Whitney*, 188 Ill. 2d 91 (1999). There, the defendant was convicted of first degree murder and aggravated discharge of a firearm when he was found to have fired shots into an occupied automobile and was sentenced to consecutive terms of imprisonment under section 5—8—4(a). *Whitney*, 188 Ill. 2d at 92-93. In the end, the court found that the requirements for section 5—8—4(a) had not been satisfied and that consecutive sentencing was improper. *Whitney*, 188 Ill. 2d at 100. In arriving at that conclusion, however, the court made a determination that section 5—8—4(a) was the only section under which consecutive sentences could be imposed upon the defendant. The court stated:

> "There is no dispute that defendant committed these crimes as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. Consequently, defendant is subject to consecutive sentences *only* if either of the exceptions set forth in section 5—8—4(a) are applicable." (Emphasis added.) *Whitney*, 188 Ill. 2d at 99.

While the court never expressly addressed section 5—8—4(b), we

find its use of the word "only" in the above-quoted passage to signify that section 5—8—4(b) could not be considered as a possibility for imposing consecutive sentences where it found that the defendant's crimes were committed in the same course of conduct during which there was no change in the nature of the criminal objective. Compare *People ex rel. Waller v. McKoski*, 195 Ill. 2d 393, 399-400 (2001) (where the court considered the interplay of section 5—8—4(a) (requiring a single course of conduct) and the 1997 amended version of section 5—8—4(b) (requiring an unrelated course of conduct) in imposing consecutive sentences where one of the offenses committed is found to be a "triggering offense," but did not comment as to whether the unrelated-course-of-conduct requirement applied to situations where no triggering offense existed but the trial court found that consecutive sentences were necessary for the protection of the public).

In other words, where the criminal objective has changed and the offenses are committed in separate courses of conduct, subsection (b) is the only means by which a defendant may be sentenced to consecutive terms, since in those situations, subsection (a) must be totally disregarded. Most cases have interpreted this to mean that because subsection (b) is the only means by which a defendant may be sentenced to consecutive terms if his offenses are not committed in a single course of conduct, *all* consecutive sentences imposed under subsection (b) *must* involve crimes that were not committed in a single course of conduct. See, *e.g.*, *Cooper*, 239 Ill. App. 3d at 360; *Porter*, 277 Ill. App. 3d at 198; *People v. Hartzol*, 222 Ill. App. 3d 631, 649 (1991) (consecutive sentences allowed under section 5—8—4(b) "where the offenses were not part of a single course of conduct and [a consecutive term was] required to protect the public").

In the case of *People v. Kagan*, 283 Ill. App. 3d 212 (1996), the Second District of this court articulately expounded the reasoning behind such an interpretation. There, the court analyzed whether a determination that a consecutive term " 'is required to protect the public from further criminal conduct by the defendant' " is all that is necessary for the imposition of consecutive sentences under the pre-1997 version of section 5—8—4(b). *Kagan*, 283 Ill. App. 3d at 221, quoting 730 ILCS 5/5—8—4(b) (West 1992). In other words, the court examined whether a trial court may impose consecutive sentences under the pre-1997 version of section 5—8—4(b) if it simply makes the finding that such sentences are necessary for the protection of the public and does not acknowledge whether the crimes were committed in a single or multiple courses of conduct, as is required in section 5—8—4(a).

For this, the *Kagan* court referenced *Cooper*, where the issue was

"whether subsection (b) allowed consecutive sentences for multiple convictions arising from a single course of conduct when the trial court determined that such sentences were necessary to protect the public from further criminal conduct by the defendant despite the language of subsection (a) prohibiting consecutive sentences for such convictions." *Kagan*, 283 Ill. App. 3d at 222, citing *Cooper*, 239 Ill. App. 3d at 358. "The [*Cooper*] court found that subsection (a) makes consecutive sentences mandatory in those instances specified, as in the case of a Class X felony accompanied by the infliction of severe bodily injury. Other than in those certain instances, subsection (a) prohibits consecutive sentences where the offenses were committed as part of a single course of conduct. *Cooper*, 239 Ill. App. 3d at 359." *Kagan*, 283 Ill. App. 3d at 222.

> "[I]n all other circumstances[, *i.e.*, when the crimes are not carried out in a single course of conduct], the imposition of consecutive sentences is within the sentencing court's discretion subject to its finding that consecutive sentences are required to protect the public from further criminal conduct by the defendant. *Cooper*, 239 Ill. App. 3d at 359. The [*Cooper*] court reviewed the legislative history of the provisions and concluded that subsection (b) does not provide another basis to impose consecutive sentences when the multiple conviction arose out of a single course of conduct; rather, it limits the discretion of the sentencing court in those circumstances where the court has discretion. *Cooper*, 239 Ill. App. 3d at 358-61." *Kagan*, 283 Ill. App. 3d at 222.

Mindful that the general rule, as expressed in subsection (a), is to prohibit consecutive sentences for offenses committed in a single course of conduct (*Bole*, 155 Ill. 2d at 197), and the policy of lenity regarding the interpretation of criminal statutes (*People v. Haron*, 85 Ill. 2d 261, 277-78 (1981)), we agree with the reasoning expressed in *Kagan* and *Cooper*.

After determining whether the offenses were carried out in a single course of conduct, we believe that a court should then look for any instances of a "triggering offense." In noting that consecutive sentences are the exception to the general rule, the supreme court in *People v. Curry*, 178 Ill. 2d 509 (1997), stated:

> "This court has determined that section 5—8—4(a) creates two exceptions to the general rule that consecutive sentences may not be imposed for multiple offenses which occur as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. The first exception occurs when one of the multiple offenses is a Class X or Class 1 felony and severe bodily injury is inflicted; the second exception occurs when one of the multiple offenses is a violation of section 12—13 (crimi-

nal sexual assault) or 12—14 (aggravated criminal sexual assault) of the Criminal Code of 1961. When a defendant's convictions bring him within either of these two exceptions, the mandatory consecutive sentencing provision of section 5—8—4(a) is triggered and consecutive sentences must be imposed." *Curry*, 178 Ill. 2d at 519-20.

The court also explained the distinction between a "triggering" offense and a "nontriggering" offense:

"The triggering offenses listed in section 5—8—4(a) are crimes of a singular nature, involving 'particularly serious invasions of the person.' [Citations.] By enacting the mandatory consecutive sentencing provision of section 5—8—4(a), the legislature sought to punish the commission of triggering offenses more harshly than the commission of other crimes. [Citation.] This legislative intent would be defeated if the triggering and nontriggering offenses were treated in a like manner. Accordingly, we hold that consecutive sentences are mandatory only for those offenses which trigger the application of section 5—8—4(a). [Citations.]

*** Consequently, section 5—8—4(a) must be construed so that any consecutive sentences imposed for triggering offenses be served prior to, and independent of, any sentences imposed for nontriggering offenses. Sentences for multiple nontriggering offenses may be served concurrently to one another after any consecutive sentences for triggering offenses have been discharged. [Citations.]" *Curry*, 178 Ill. 2d at 538-39.

In the case before us, the only potentially applicable triggering offense in section 5—8—4(a) is that the defendant could have committed a Class X or Class 1 felony where he "inflicted severe bodily injury during the commission of that felony" (730 ILCS 5/5—8—4(a) (West Supp. 1999)). See *People v. Whitney*, 188 Ill. 2d 91, 98-99 (1999).

If multiple offenses were committed in a single course of conduct and one or more of the offenses fall under the exceptions listed in section 5—8—4(a), consecutive sentences are mandatory. "The test to be used in determining whether a particular offense is part of a single course of conduct, during which there was no *** change in the nature of the criminal objective, is the independent motivation test; that is, were the defendant's acts independently motivated?" *People v. Harris*, 220 Ill. App. 3d 31, 32 (1991). This test was adopted by our supreme court in *People v. Bell*, 196 Ill. 2d 343 (2001). *Bell* cited *Harris* and *Kagan*: "If there was a substantial change in the nature of the criminal objective, the defendant's offenses are part of an 'unrelated course of conduct' ***." *Bell*, 196 Ill. 2d at 354-55. While not applicable to the case at bar, we note that if there were triggering offenses committed after July 22, 1997, and they were not committed in a single course of conduct, section 5—8—4(b) would apply and consecutive sentences

would be mandatory under the amended version of that provision. See *McKoski*, 195 Ill. 2d at 399.

■ In the present case, however, the court eschewed a determination of whether one of the exceptions outlined in section 5—8—4(a) was applicable. Instead, it made the determination that, under section 5—8—4(b), consecutive sentences were appropriate to protect the public from further criminal conduct by the defendant. Nevertheless, it did not make a finding as to whether the offenses committed on November 3, 1995, of which defendant was convicted, arose out of a single course of conduct. Not surprisingly, the parties disagree on this point. Under normal circumstances:

> "Because the determination of whether a defendant's actions constituted a single course of conduct is a question of fact (*People v. Edwards*, 259 Ill. App. 3d 151, 156 (1994)), we will defer to the trial court's conclusion unless that conclusion is against the manifest weight of the evidence. *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 278 (1999). So long as the trial court's conclusion is supported by the record, *i.e.*, not unreasonable or arbitrary, we will not reverse its decision. *Jordan v. National Steel Corp.*, 183 Ill. 2d 448, 456 (1998)." *People v. Daniel*, 311 Ill. App. 3d 276, 287 (2000).

Here, because the court made no conclusion as to the defendant's course of conduct, we cannot simply defer to its determination which, at best, only implicitly finds that the defendant's actions were not carried out in a single course of conduct. Consequently, we reverse and remand this cause only with respect to the court's imposition of consecutive sentences so that the trial court may entertain the factual question of whether defendant's actions were committed in a single course of conduct. If it finds that all of the offenses were not carried out in a single course of conduct, it may, in its discretion, apply section 5—8—4(b).

We stress, however, that if the court should determine that any of the offenses were carried out in a single course of conduct, it may *only* use section 5—8—4(a) to impose consecutive sentences for those offenses. If the court applies that subsection, it must then also decide: (1) whether any of the crimes found to have been committed in a single course of conduct are a Class X or Class 1 felony; (2) whether the defendant inflicted a severe bodily injury; and (3) whether that severe bodily injury was inflicted during the commission of any of the Class X or Class 1 felonies on the victim of those felonies. The court may impose consecutive sentencing under section 5—8—4(a) *only* if all three components are met.

We are acutely aware that applying sections 5—8—4(a) and 5—8—

4(b) has been extremely difficult for trial courts as well as for courts of review. However, an analysis of the various amendments to section 5—8—4 as well as the pertinent case law has revealed the following. In *Curry*, the supreme court held that "consecutive sentences are mandatory only for those offenses which trigger the application of section 5—8—4(a)." *Curry*, 178 Ill. 2d at 538. Since 1988, section 5—8—4(a)(i) (730 ILCS 5/5—8—4(a)(i) (West Supp. 1999)) has required consecutive sentences for "a Class X or Class 1 felony and the defendant inflicted severe bodily injury"; section 5—8—4(a)(ii) has required consecutive sentences for convictions of criminal sexual assault and aggravated criminal sexual assault. Effective January 1, 2000, first degree murder and many charges of armed violence were added as triggering offenses.

If the offenses occurred after 1988 and were committed in a single course of conduct, section 5—8—4(a) requires consecutive sentencing for any triggering offense. *Curry*, 178 Ill. 2d at 538. If the offenses were committed in a single course of conduct and none were triggering offenses, section 5—8—4(a) prohibits consecutive sentencing. *Daniel*, 311 Ill. App. 3d at 287.

As previously mentioned, prior to July 22, 1997, section 5—8—4(b) gave the trial court the discretion to impose consecutive sentences on *any* crime not committed in a single course of conduct if the court made a finding that such sentences were necessary to protect the public. *Cooper*, 239 Ill. App. 3d at 359-60. After July 22, 1997, if the crimes were not committed in a single course of conduct, and one of them was a triggering offense, section 5—8—4(b) requires consecutive sentencing on the triggering offense. *People v. Conley*, 306 Ill. App. 3d 1 (1999). After July 22, 1997, if the crimes were not committed in a single course of conduct, and none of them was a triggering offense, section 5—8—4(b) gives the trial court discretion to impose a consecutive sentence if it makes the finding that consecutive sentences are necessary to protect the public. *People v. Stacey*, 193 Ill. 2d 203, 211 (2000).

Ultimately, therefore, consecutive sentences will be appropriate in only three types of cases: (1) the instance where the offenses were found to be carried out in a single course of conduct and one of the triggering exceptions in subsection (a) was found; (2) the instance where the offenses were found not to be carried out in a single course of conduct, were committed after July 22, 1997, and a triggering exception in subsection (b) was found; and (3) the instance where the offenses were found not to be carried out in a single course of conduct and the court makes a specific finding that a consecutive term is required to protect the public and sets forth the basis of that finding in the record. In all other circumstances, consecutive sentences are prohibited.

For the reasons set forth, we affirm defendant's convictions for first degree murder, armed robbery, and aggravated kidnaping, but vacate the trial court's imposition of consecutive sentences under section 5—8—4(b) and remand for further proceedings consistent with this opinion.

Affirmed in part and vacated in part; cause remanded.

QUINN, P.J., concurs.

JUSTICE THEIS, specially concurring:

I completely agree with the majority's analysis in this case, except for its holding regarding the admission of gang evidence. Our supreme court has recently addressed this issue, once again recognizing that "street gangs are regarded with considerable disfavor by other segments of our society." *People v. Strain*, 194 Ill. 2d 467, 477, 742 N.E.2d 315, 320 (2000). Moreover the court has acknowledged that, "particularly in metropolitan areas, there may be strong prejudice against street gangs." *Strain*, 194 Ill. 2d at 477, 742 N.E.2d at 320.

Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial value. *People v. Gonzalez*, 142 Ill. 2d 481, 487, 568 N.E.2d 864, 866 (1991). In this case, the majority finds the evidence of gang membership was relevant to the issue of a common scheme of conducting an armed robbery. However, whether the robbers were accountable for the actions of the others was never in dispute. Rather, the theory of defense was that defendant was not present and did not in fact commit the crime.

The majority also finds the gang evidence was relevant because the crime was committed at the "behest" of Nose. First, defendant's state of mind and motivation in the armed robbery were never an issue for the jury to decide. Second, I believe the majority has overstated the record. There was no evidence that gang hierarchy or discipline motivated defendant to join Nose when he said, "We got to hit a lick." Unlike other cases allowing gang evidence, there was no evidence of gang warfare or gang retaliation (*Strain*, 194 Ill. 2d at 479, 742 N.E.2d at 322), no invasion of rival gang territory (*People v. Colon*, 162 Ill. 2d 23, 30, 642 N.E.2d 118, 121 (1994)), no gang signs flashed or gang slogans shouted (*People v. Jones*, 259 Ill. App. 3d 905, 911, 632 N.E.2d 293, 297 (1994)), and no evidence victims were chosen because they were rival gang members (*People v. Ellis*, 315 Ill. App. 3d 1108, 1120, 735 N.E.2d 736, 746 (2000)).

I believe the questionable probative value of defendant's gang

membership, and especially his gang nickname, "Big Murder," was substantially outweighed by its obvious strong prejudicial value. While I would find the trial court erred, I would also hold such error was harmless in light of the overwhelming evidence against defendant. *People v. Parker*, 311 Ill. App. 3d 80, 92, 724 N.E.2d 203, 212 (1999). I write specially to make clear gang evidence should not be admitted in every case where defendants act in concert.