2023 IL App (1st) 211171-U
No. 1-21-1171
Order filed October 27, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 12551 |
| | ) | |
| RUBEN FLEMING | ) | Honorable |
| | ) | Arthur F. Hill, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justice Pucinski concurred.
Justice Lavin specially concurred.

**ORDER**

¶ 1    *Held:* Affirmed, where the circuit court had jurisdiction to hold an evidentiary hearing when it followed this court's mandate and did not manifestly err by denying petitioner's *Krankel* claims.

¶ 2    The constitutional rights to counsel and a jury trial, while paramount, do not alone protect

the accused. Jurors must presume innocence before reaching a verdict. The trial court directs them

to base that verdict on the evidence, not emotions. And the trial court sees that counsel provides

the accused with effective assistance.

¶ 3    Ruben Fleming claims several errors undermined these bulwarks and seeks a new trial. He claims his counsel (i) forced him to appear before prospective jurors in unkempt clothing, including prison garb, (ii) left on the jury a former prosecutor who looked hostile, and (iii) lacked facts needed to discredit the victim's testimony in two ways.

¶ 4    While Fleming's claims are serious, sound reasons support denial. We cannot find, as we must, that the truth of his claims is clearly evident, plain, and indisputable. The record shows some claims depend on Fleming's word alone, but Fleming's accounts impacted his credibility. For the others, Fleming overlooks reasons apparent in the record for counsel's actions. So we must affirm.

¶ 5                                              Background

¶ 6    Fleming appeals for a second time. In the earlier appeal, we rejected claims (i) the victim's identification of him was unreliable and thus insufficient proof of guilt and (ii) the State committed misconduct during closing arguments. *People v. Fleming*, 2016 IL App (1st) 141355-U, ¶ 35, 40.

¶ 7    But we agreed that a new judge should conduct a "preliminary *Krankel* inquiry." *Id.* ¶ 59. The *Krankel* process began after trial when Fleming wrote a letter to the trial court complaining about counsel. The trial court then did what it may not: allowed the State to participate during the inquiry into those claims. *Id.* ¶ 57. We remanded. *Id.* ¶ 59.

¶ 8    On remand, Fleming retained new counsel, who filed two motions amending the claims and adding others. For reasons we will discuss, the circuit court denied Fleming's claims. We set out pertinent parts of the record, claim by claim, before summarizing the proceedings on remand.

¶ 9                                        Fleming's clothing

¶ 10   Before prospective jurors appeared in the courtroom, the trial court asked counsel about Fleming's clothing. One of Fleming's two attorneys replied that he had "a shirt" for him, and co-

counsel would bring "a set of clothes." The trial court explained that it would soon bring in the prospective jurors, give short remarks, and release them for lunch.

¶ 11    But that did not happen. After a break and handling other matters, the trial court directed counsel to "get [Fleming's] clothing situation squared away." After another break, it recalled the case and began voir dire. The record does not show when Fleming changed clothes.

¶ 12    In a post-trial letter, Fleming complained that counsel "forced" him to "introduce [himself] to the jurors" while "wearing [b]rown DOC pants," specifically "the jail uniform issued [] in Cook County." He claimed that prospective jurors, those sitting on "the left side of the courtroom," "knew [he] was incarcerated."

¶ 13    At the initial *Krankel* inquiry, Fleming elaborated, as did one of his attorneys. Fleming again stated his "brown DOC pants" signaled his custody status, plus that his "button-up" shirt did not "look presentable at all." Counsel recalled Fleming "had a civilian shirt on" and "wore his DOC" pants "inside out," and said, "[T]here was no representation of IDOC [*sic*] on his pants."

¶ 14    Hearing this, the trial court focused on whether the pants were inside out. Fleming confirmed they were and that prospective jurors "could still see the stamp on the pants leg" and infer his custody status from his jail-issued shoes.

¶ 15    On remand, Fleming wrote in a motion that counsel "forced" him to wear "DOC pants" "inside out" but "with the DOC markings still visible" and "Cook County Jail shoes." At the evidentiary hearing on that motion, Fleming testified that "DOC" appeared "down the right leg," and he wore the pants inside out after protesting to counsel. Also, the long-sleeve, collared shirt was a casual blue and white, "with a lot of buttons missing and ketchup stains and stuff like that."

¶ 16    Fleming testified that he wore these clothes "[d]uring the jury introduction," including some of voir dire but not all. Otherwise, he wore "appropriate attire."

¶ 17                                    Former Prosecutor as Juror

¶ 18    A former prosecutor, Zachary Rami, served as a juror. During voir dire, Rami disclosed his previous employment and said he could "give both sides [] a fair trial." Counsel did not move to strike Rami for cause nor exercise a peremptory strike.

¶ 19    In a post-trial letter, Fleming complained that counsel "boldly lied in [his] face" by telling him that they had struck Rami from the jury panel. Fleming had noticed Rami's "stare downs" and "facial mean muggin." Fleming asked counsel "to use [his] strike," and counsel, "said they did strike him when they didn't."

¶ 20    At the initial *Krankel* inquiry, Fleming said he "felt uncomfortable with [Rami]" because of his "facial mean mugging, cold stares." When Fleming conferred with counsel, they agreed to use a peremptory strike but did not follow through. Later, according to Fleming, his counsel admitted that this was error.

¶ 21    On remand, Fleming wrote in a motion that he asked counsel to strike Rami. Counsel agreed, and later admitted to making a mistake by having failed to strike Rami. Fleming testified that counsel had helped him notice Rami "mugging" and "making little faces." Fleming said at the hearing that his counsel told him, "We made a mistake; we must have struck the wrong juror."

¶ 22                                    Victim's Testimony

¶ 23    The critical issue at trial was the identification of the shooter. The defense argued that the victim, Desmond James, did not see who shot him and falsely accused Fleming from the stand. In

contrast, the State argued the jury should believe James. But the State's case did not depend on James's credibility.

¶ 24 The State argued that even if the jury did not believe James, the circumstances proved guilt. Undisputed was that (i) James placed a boot on a car with Fleming's license plate, (ii) Fleming became violent, swinging a stick at James, who retreated; (iii) Fleming left, and (iv) minutes later, someone shot James. The State maintained this amounted to proof beyond a reasonable doubt.

¶ 25 James testified that, while working for the city, he booted a car with plates registered to Fleming. A woman came outside from a nearby residence, yelling at James. Fleming followed her. Both asked James to remove the boot. James said he could not, and Fleming began swearing and threatening violence. Fleming also tried to hit him, but the woman blocked Fleming. "At that time, I tried to just put some distance between us," James said. After James backed away, Fleming swung a tree branch at him. James went to a nearby intersection and called his dispatcher for police help.

¶ 26 James overheard an older man tell Fleming, "Get in the house; you going to get in more trouble than you're already in. You know the police are coming." James returned to his van as the older man and Fleming argued. Seeing James, Fleming again grabbed the branch, approached James, and swore. James went back to the intersection, and Fleming ran toward the residence and out of his sight. A nearby roofer testified to a similar account, adding that he saw one of the men remove the car's license plates before running off.

¶ 27 According to James, minutes later, Fleming emerged from an alley 40 to 50 feet away. (Counsel for Fleming would focus on this estimate in closing argument.) Fleming extended his hand at shoulder height with his knuckles pointing toward James. Although James denied seeing a gun, he heard a "pop." "[R]ealiz[ing] it was a gun," James turned, ran, and heard two more pops.

(The nearby roofer heard the shots, too.) One bullet hit James, knocking him to the ground. He felt pain in his back, rose, and hobbled toward a tree, where he collapsed. His supervisor and the police soon arrived. James described the shooter's clothing to a responding officer.

¶ 28    Later that day, after surgery, James spoke to Detective John Otto, who showed him a photo array. James testified that he identified Fleming as the shooter. Otto testified on direct examination to James selecting Fleming's photo. Counsel for Fleming cross-examined Otto on this point. Otto testified that James identified Fleming as "just the person that was verbally and physically assaulting him."

¶ 29    Ten months later, James identified Fleming in a lineup. And later that day, James spoke to a prosecutor and another detective. Although not present, Otto prepared a report containing that interview's contents. The report suggests that James first identified Fleming as the shooter then and not the day of the shooting. Counsel did not call the other detective to testify. The court sustained objections to counsel inquiring of Otto about the report's contents.

¶ 30    Police collected three cartridge cases near the mouth of an alley. A map of the area, which the State presented during James' testimony, showed seven houses could separate the intersection where James stood from the alley where the casings lay. (Counsel for Fleming used this exhibit, a piece of tape marking off a 40-foot distance, and an appeal to common sense to argue in closing that "seven houses away is not even remotely 40 feet.")

¶ 31    A ballistics expert testified that the three casings came from the same gun. Counsel for Fleming cross-examined the expert and elicited that the gun could have been a handgun or a rifle. (Counsel argued in closing that common sense suggested shooting James from seven houses away would be difficult.)

¶ 32    Police later arrested Fleming. Fleming provided a false name and resisted being photographed.

¶ 33                              Proceedings on remand

¶ 34    The circuit court received this court's mandate ordering a "preliminary *Krankel* inquiry." Through hired counsel, Fleming filed motions attacking his trial counsel's performance. The circuit court judge, who did not preside over the trial, read Fleming's first motion and this court's decision. Without the State's input, it determined to hold "a full *Krankel* hearing."

¶ 35    Later, the circuit court learned of an appellate court decision questioning the nature of the preliminary *Krankel* process. *People v. Roddis*, 2018 IL App (4th) 170605, ¶¶ 47, 51 (holding, hiring private counsel obviates need for preliminary inquiry). The circuit court worked with counsel and the State to draft a motion seeking this court's guidance. We declined.

¶ 36    Before the circuit court, Fleming raised three of the four claims he now pursues. First, counsel forced Fleming to appear "with DOC pants inside out, with the DOC markings still visible, and Cook County jail shoes." Second, counsel failed to strike former prosecutor Rami despite agreeing to Fleming's request he be excluded. Third, counsel failed to impeach James with prior statements. Fleming presented his own testimony supporting the first two issues at an evidentiary hearing. He also presented the testimony of Detective Otto and two stipulations, one from Detective R. Sullivan and another from a paramedic.

¶ 37    Fleming concedes he forfeited part of the fourth issue he pursues: whether counsel needed to support further impeachment arguments with crime-scene measurements and expert testimony on firearms. On remand, the circuit court heard no evidence about "why the type of gun mattered" or that "an accurate, 250-foot shot required a rifle."

¶ 38                                    Analysis

¶ 39     This appeal calls for review of an evidentiary hearing under *People v. Krankel*, 101 Ill. 2d 181, 189 (1984). Fleming raises four claims. To prevail, Fleming must show that the circuit court manifestly erred by denying these claims. *People v. Jackson*, 2020 IL 124112, ¶ 98.

¶ 40                          Circuit Court Followed Mandate

¶ 41     In the State's view, this court's mandate directed the circuit court to conduct "only a preliminary *Krankel* inquiry," yet the circuit court proceeded as if Fleming had an "automatic right to a full evidentiary hearing." Because it "skipped" a step, the State contends that the circuit court "exceeded its jurisdiction."

¶ 42     In Fleming's first appeal, we ordered "a new *Krankel* hearing before a different judge and without the State's adversarial participation[.]" *Fleming*, 2016 IL App (1st) 141355-U, ¶ 59. On remand, a new judge read Fleming's *Krankel* motion and our decision and determined, without the State's input, to conduct "a full *Krankel* hearing."

¶ 43     The State faults the circuit court for "grant[ing] defendant's motions [*sic*] for an 'evidentiary *Krankel* hearing' and conducting a full evidentiary hearing," but does not contend the claims in Fleming's first motion failed to show that counsel possibly neglected the case. See *Jackson*, 2020 IL 124112, ¶ 97 (requiring court to find "possible neglect" before holding evidentiary hearing). We find that the circuit court complied with our mandate.

¶ 44     As an aside, our directive may have seemed less simple to the circuit court after an apparent split in authority arose within districts of the appellate court. Compare *People v. Reed*, 2018 IL App (1st) 160609, ¶ 51 (holding, appointing new counsel does not obviate need for preliminary

inquiry) with *Roddis*, 2018 IL App (4th) 170605, ¶¶ 47, 51 (holding, hiring of private counsel obviates need for preliminary inquiry).

¶ 45    Still, contrary to the special concurrence's contention in paragraph 85, Fleming had an opportunity to make a showing of possible neglect. Indeed, through hired counsel, Fleming successfully alleged that trial counsel failed to strike a hostile juror, a claim Fleming supported with his own recollection of off-the-record facts. *People v. Maya*, 2019 IL App (3d) 180275, ¶ 36. And contrary to the contentions in paragraph 82 and in footnotes two and three, the circuit court did not fail to conduct a preliminary *Krankel* inquiry, even if the proceedings then dragged as the parties and circuit court took a scholarly detour, attempting to reconcile *Reed* and *Roddis*.

¶ 46    The circuit court may only do what this court's mandate permits. *PSL Realty Co. v. Granite Inv. Co.*, 86 Ill. 2d 291, 308 (1981). The circuit court honored this duty. *People v. Golen*, 2015 IL App (1st) 133433, ¶ 9 (applying *de novo* review).

¶ 47                              Rejection of Fleming's claims

¶ 48    Fleming claims counsel provided ineffective assistance in several ways. For each claim, Fleming must make two showings: (i) the action he challenges was not reasonable under prevailing professional norms (*Strickland v. Washington*, 466 U.S. 668, 687-89 (1984)) and (ii) had counsel not erred, there was a reasonable probability of an acquittal. *Strickland*, 466 U.S. at 687-89. Measuring that probability requires consideration of all the evidence before the jury. *People v. McCarter*, 385 Ill. App. 3d 919, 935-36 (2008). In other words, we ask how an error impacted the jury's "overall picture of events." *Id.* at 936.

¶ 49    The posture of this case calls for a double dose of deference. We defer to many of counsel's on-the-ground choices, taking care not to second-guess tactics. *Strickland*, 466 U.S. at 687-89.

And we defer to the denial of Fleming's claims after hearing them in full unless the claims' merits are "clearly evident, plain, and indisputable." *Jackson*, 2020 IL 124112, ¶ 98. We may affirm the denial for any reason apparent in the record. *People v. Johnson*, 208 Ill. 2d 118, 129 (2003).

¶ 50     But we do not affirm because Fleming forfeited claims, as the State argues we should. See *People v. Maya*, 2019 IL App (3d) 180275, ¶¶ 19-22 (rejecting similar arguments). But more to the point, forfeiture limits a party's ability to raise issues, not this court's power to analyze those issues and reach a just result. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). We assess Fleming's claims, many raised nearly a decade ago, and find the circuit court did not manifestly err by denying them.

¶ 51                         Fleming's clothing

¶ 52     Fleming argues counsel erred by introducing him to prospective jurors in clothing that made him "look, at best, like a vagrant[,]" and the circuit court manifestly erred by rejecting this claim. He contends he wore pants issued by the Department of Corrections, and despite wearing them inside out, the pants "still displayed the DOC logo." Also, his shirt was "ketchup-stained, buttons-missing, and probably rumpled." All this prejudiced him, he contends, because "[f]irst impressions are lasting impressions," and this "impression denied [him] the presumption of innocence."

¶ 53     Appearing in prison garb undermines the presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976). So does letting the accused look unkempt. See *People v. Steimetz*, 287 Ill. App. 3d 1, 7 (1997) (criticizing court for denying brief recess so accused could don civilian clothing). The accused have "the right to stand trial with the appearance, dignity, and self-respect of [the] free and innocent[.]" *In re Staley*, 67 Ill. 2d 33, 37 (1977). So, contrary to the special

concurrence's assertion in paragraph 91, Fleming rightly focuses on counsel, for "it is through counsel that the accused secures his other rights." *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986). Counsel must not present the accused in prison garb.

¶ 54    But Fleming's claim amounts to little more than speculation that prospective jurors (i) saw what he claimed they saw and (ii) drew the inferences he claims they drew. The record shows that he told several versions of events that left the circuit court to speculate about who saw what.

¶ 55    Consider the "what:" his clothing and seating. As set out in his *pro se* letter, his initial claim was that counsel forced him to wear "[b]rown DOC pants." Then, at the initial inquiry, Fleming admitted he wore the pants inside-out, having heard counsel say that the judge. Only at that hearing did Fleming first assert that prospective jurors could (i) see the impression of a DOC logo as he sat at a table, (ii) infer his custody status from his shoes, and (iii) see that his shirt was not "presentable." On remand, he added that he stood for a time and wore a blue-and-white shirt with "a lot of buttons missing and ketchup stains and stuff like that." On appeal, he adds that his shirt was "probably rumpled," too.

¶ 56    What others saw has changed over time, and so too has the "who." In the *pro se* letter, his initial claim was that some prospective jurors saw him in those clothes. On remand, Fleming testified his outfit was visible to all prospective jurors.

¶ 57    Fleming contends the circuit court manifestly erred by rejecting his testimony. See *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981) (finding manifest error where court rejected unrebutted, unimpeached, plausible testimony). We disagree.

¶ 58    For one, the record shows the success of this claim depended on Fleming's testimony, but Fleming's account morphed, impacting his credibility. *People v. Morgan*, 212 Ill. 2d 148, 165

(2004) (finding no manifest error where record facts and circuit court's observations supported rejection of recantation testimony). By rejecting his testimony, the circuit court could have properly concluded that Fleming's clothing was not unkempt, and the prospective jurors could not identify as prison garb his shoes and inside out pants.

¶ 59    More importantly, Fleming only testified about what prospective jurors could have seen when shuffled in and out of the courtroom. Fleming offered no testimony about specific reactions by specific people. There is no evidence of prospective jurors looking at him rather than counsel or the court. Likewise, he presented no evidence about what inferences these prospective jurors drew from what they saw. Contrary to Fleming's contention, the circuit court acted within its discretion by rejecting his claim. See *People v. Motzko*, 2017 IL App (3d) 160154, ¶ 18. (noting, circuit court in "far better position" to assess credibility).

¶ 60    Moreover, even if counsel erred, Fleming offered no evidence showing how his clothing impacted the jury's "overall picture of events." *McCarter*, 385 Ill. App. 3d at 936. Fleming admits this error was brief. Against this, the overall picture of events showed the State arguing for the jury to return guilty verdicts without assessing the credibility of Fleming, who waived the right to testify and without crediting James' identification. The State stressed in closing that the undisputed facts were proof beyond a reasonable doubt of guilt. James placed a boot on a car with Fleming's license plate; Fleming became violent; James retreated; Fleming also left; and minutes later, someone shot James. All this was substantial evidence of Fleming's guilt. See *People v. Sutherland*, 155 Ill. 2d 1, 25 (1992) (finding overwhelming volume of circumstantial evidence).

¶ 61    All this left the jury speculating about a mystery shooter appearing in a "couple of minutes." Speculation offers no basis for finding a reasonable probability that the jury would have

acquitted. *McCarter*, 385 Ill. App. 3d at 936. Thus, the record justifies the denial on this basis, too. *Johnson*, 208 Ill. 2d at 129 (reviewing court may affirm denial for any reason apparent in record).

¶ 62                                    Former Prosecutor as Juror

¶ 63    Fleming's next claim also amounts to little more than speculation. Fleming acknowledges former prosecutor Rami's "words alone"— answers during voir dire—"did not show bias." But Fleming argues he and counsel saw Rami "eyeing [Fleming] strangely" during voir dire. Given that demeanor, counsel agreed with Fleming to strike Rami. And because counsel later acknowledged having mistakenly failed to strike Rami, counsel's actions were "objectively unreasonable," and the circuit manifestly erred by rejecting this claim.

¶ 64    Jurors must act without bias or prejudice. *People v. Williams*, 164 Ill. 2d 1, 16 (1994). And counsel has an obligation to prevent biased and prejudiced people from sitting as jurors. *People v. Manning*, 241 Ill. 2d 319, 336 (2011) (analyzing whether counsel provided ineffective assistance by failing to strike juror). Jurors must rest their verdict on the evidence, not emotions. See *People v. Thompson*, 238 Ill. 2d 598, 610 (2010) (discussing trial principles jurors must follow).

¶ 65    Emotional bias underlies this claim. As Fleming describes it, Rami stared at him or "mean mugged" him, suggesting Rami harbored bad intent. Fleming contends his "unrebutted testimony" showed that Rami could not be fair and "counsel failed to do what counsel intended to do," striking Rami from the jury.

¶ 66    But Fleming's claim changed over time, and the circuit court could reject the claim on this basis. Fleming's *pro se* letter stated that he alone noticed Rami's demeanor and believed counsel "boldly lied" while conspiring with the State to convict him. At the initial *Krankel* inquiry, Fleming asserted that counsel admitted making a mistake by not striking Rami, but not until remand did

Fleming add that counsel had "helped [him] notice" Rami's demeanor and quote counsel as stating, "We made a mistake, we must have struck the wrong juror."

¶ 67　These iterations bear on Fleming's contention that the circuit court manifestly erred by rejecting his testimony. *Baker*, 88 Ill. 2d at 85 (finding manifest error where court rejected unrebutted, unimpeached, plausible testimony). Fleming insists his testimony was plausible and unrebutted. *People v. Relwani*, 2019 IL 123385, ¶ 18 (basing judgment on something other than evidence is manifest error). We disagree. The record shows Fleming's accounts impacted his credibility. *Morgan*, 212 Ill. 2d at 165 (finding no manifest error where record facts and circuit court's observations supported rejection of recantation testimony). The circuit court could have properly concluded that Juror Rami's demeanor evinced no bias. *Motzko*, 2017 IL App (3d) 160154, ¶ 18 (noting, circuit court in "far better position" to assess credibility). Thus, contrary to Fleming's contention, the record contains a basis to affirm the circuit court's denial of this claim. *Johnson*, 208 Ill. 2d at 129 (reviewing court may affirm denial for any reason apparent in record).

¶ 68　　　　　　　　　　　　　Victim's Testimony

¶ 69　Fleming argues counsel lacked facts needed to pursue key parts of the defense. In his view, counsel "tried, but failed, to show" James "changed his story as to whether he saw Fleming with a gun." Likewise, counsel tried and failed to show that "at least 250 feet separated James from the shooter" and "such a long shot likely required a rifle."

¶ 70　Both claims concern impeachment and require Fleming to rebut a presumption counsel acted strategically. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24 (rebutting presumption requires showing "no effective defense attorney would have pursued [] strategy"). Still, Fleming's

claims do not concern significant impeachment evidence, and we find no fault with counsel's actions.

¶ 71    Fleming hones in on whether counsel impeached James' testimony that he identified Fleming as holding a gun not on the day of the shooting but 10 months later. With this narrow focus, Fleming sells short counsel's successful impeachment after James testified to having identified Fleming as the shooter that same day. See *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007) (noting, reliability of eyewitness identification turns partly on time between crime and confrontation).

¶ 72    James spoke to Detective John Otto after the shooting and viewed a photo array. At trial, James testified that he identified Fleming as the shooter during that conversation. But counsel elicited from Otto on cross-examination that James identified Fleming as "just the person that was verbally and physically assaulting him." This mattered because the first encounter by the car was a verbal and physical assault; the second encounter away from the car involved the shooting. In context, Otto's testimony was a powerful blow to James' credibility.

¶ 73    Fleming underscores that point by nitpicking counsel's impeachment about a much later statement. Fleming argues counsel should have impeached James' testimony that he told officers 10 months after the shooting that he saw Fleming holding a gun. At best, impeachment on this point related indirectly to the key issue at trial—identification. Effective counsel could have forgone the minor tactic Fleming now trumpets. *Zambrano*, 2016 IL App (3d) 140178, ¶ 24. Counsel did not err.

¶ 74    Next, Fleming weaves stray lines from the record to fault counsel for not proving the shooter stood far away while likely holding a rifle, not a handgun. Once again, he sells short

counsel's attacks on James' identification. See *Strickland,* 466 U.S. at 691 (noting, reasonable decisions make investigations unnecessary).

¶ 75    Counsel exploited conflicts within the State's evidence. James testified he saw Fleming emerge 40 to 50 feet away, pointing his hand in a way that suggested he was holding a handgun. Nevertheless, James marked a map showing that seven houses could separate the location at which he stood from where Fleming appeared and where the cartridge cases lay. This evidence conflicted, obviating counsel's need to measure that distance. See *People v. Bradford*, 106 Ill. 2d 492, 499 (1985) (noting, impeaching evidence destroys credibility rather than establishing truth of impeaching evidence). Indeed, counsel marked off a 40-foot distance in closing argument without objection and contended, "[S]even houses away is not even remotely 40 feet." Counsel did not err.

¶ 76    In addition, Fleming contends counsel needed to call a ballistics expert to prove the weapon the shooter held was likely a rifle, not a handgun. Counsel, however, made a similar point to the jury. Counsel elicited from the State expert that a rifle could have fired the casings recovered by the police. Counsel then argued a shot like the one James' described on the stand—at the distance he marked on the map, holding what he inferred Fleming held—would have been difficult. This evidence and argument undercut James' credibility and, with it, his identification of Fleming. That Fleming now imagines new ways to raise old points does not support a finding counsel erred.

¶ 77    Even if counsel erred, Fleming cannot show prejudice. For our noted reasons, the State presented substantial circumstantial evidence that Fleming shot James. The circuit court's denial of these claims was not error, much less manifest error.

¶ 78    Affirmed.

¶ 79    JUSTICE LAVIN, specially concurring:

¶ 80    I agree with the circuit court's determination that, following the evidentiary hearing under *Krankel*, defendant failed to establish his private trial attorneys were constitutionally ineffective. That decision was not manifestly erroneous. See *Jackson*, 2020 IL 124112, ¶ 98; see also *People v. Relwani*, 2019 IL 123385, ¶ 18 (noting, a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence). I write separately because for the reasons to follow, I do not believe the circuit court properly complied with the appellate court mandate, although this error did not then oust the circuit court of jurisdiction as the State argues.

¶ 81    As to the mandate in the direct appeal, this court wrote:

"Here, the record shows that the [trial] court allowed the State to respond to defendant's *pro se* arguments of ineffective assistance of trial counsel during the preliminary *Krankel* inquiry. Following the State's response, defendant was allowed to argue in rebuttal. The trial court erred in allowing the State to confront and challenge defendant's claims when defendant was not represented by counsel. *** Accordingly, pursuant to [*People v. Jolly*, 2014 IL 117142, ¶ 38], we remand for a new preliminary *Krankel* inquiry before a different judge and without the State's adversarial participation." *People v. Fleming*, 2016 IL App (1st) 141355-U, ¶ 57; see also *Jolly*, 2014 IL 117142, ¶ 46 (issuing said remedy).[1]

Whether a court properly conducted a *Krankel* preliminary inquiry presents a legal question warranting *de novo* review. *People v. Jackson*, 2020 IL 124112, ¶ 98.

---

[1]The majority omits any citation to paragraph 57 of the direct appeal, which specifically spells out what is required on remand. Instead, the majority cites only the direct appeal order's conclusion, which among other things affirms the judgment and requires a "new *Krankel* hearing." However, the majority fails to acknowledge that the conclusion incorporates paragraph 57 with the words, "[f]or the reasons stated." *Fleming*, 2016 IL App (1st) 141355-U, ¶ 57, 59-60. Moreover, the court on remand specifically read paragraph 57 into the record.

¶ 82    Here, the record unequivocally shows that the circuit court on remand failed to conduct the preliminary inquiry as directed (see *Fleming*, 2016 IL App (1st) 141355-U, ¶ 57) and instead automatically permitted new private counsel leave to appear on defendant's behalf. The court then cited its own allowance of new counsel as the basis for having "satisfied *Krankel*" and the mandate. Following numerous status hearings, wherein the court and attorneys for both the State and defense expressed confusion as to what was required by the mandate, the cause proceeded directly to a full evidentiary *Krankel* hearing on defendant's ineffective assistance of trial counsel claims raised pursuant to his amended motion for a *Krankel* hearing.[2]

¶ 83    Yet, our supreme court has long held in *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003) that:

"New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. Rather, when a defendant

---

[2]Contrary to the State's contention otherwise, defendant's *Krankel* counsel did indeed orally request "an initial hearing where the state [*sic*] doesn't participate and Your Honor makes a judgment call of whether or not we will proceed to a full Krankel [*sic*] hearing." In a later status hearing on March 12, 2019, after defense counsel had filed a *Krankel* motion, the court asked counsel whether the appellate court had already decided some of the issues he was raising. Counsel responded: "I understand what you're saying Judge. My understanding was it's suppose[d] to be a full Krankel [*sic*] hearing [*sic*] back here though." The court stated that "of course we're going to have a full hearing at least at some point on this case regarding Krankel [*sic*]." Defense counsel then clarified in reference to the appellate mandate, "my impression was that they were authorizing *a full at least preliminary* hearing into whether or not an evidentiary hearing for Krankel [*sic*] would be appropriate." (Emphasis added.) The judge and defense counsel then agreed to gather more information before deciding how to proceed. Although the State apparently was present at that hearing, it did not participate. These interchanges demonstrate that the defense on remand had requested first a preliminary hearing.

During the subsequent status hearings, wherein the parties and the court expressed varying degrees of confusion about the mandate, the circuit court went so far as to propose a motion for the appellate court's consideration clarifying how to proceed and also contacted the clerk of the appellate court about the mandate. At one point, the State suggested the case should go back to the original trial court to address a motion for a new trial. Ultimately, the circuit court accepted that the appellate court no longer had jurisdiction and declared that he was "going to conduct a hearing on a motion for new trial based solely on ineffective assistance of counsel." It's worth noting that a *Krankel* motion is distinct from a motion for a new trial, insofar as a *Krankel* motion is narrower in scope because it only addresses the matter of ineffective assistance of trial counsel. Based on the foregoing, I also find the record contradicts the majority's portrayal that the remand court decided to conduct an evidentiary hearing under *Krankel* without the State's input.

presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance. The appointed counsel can independently evaluate the defendant's claim and would avoid the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to defendant's position." *Id.* (citations omitted); see also *Jolly*, 2014 IL 117142, ¶ 29, quoting *Moore*; see also *Jackson*, 2020 IL 124112, ¶ 97, citing *Jolly* and *Moore*.

¶ 84    As *Jolly* noted, a preliminary *Krankel* hearing should operate as a neutral nonadversarial proceeding because "a defendant is not appointed new counsel at the preliminary *Krankel* inquiry." *Jolly*, 2014 IL 117142, ¶ 38. In reaffirming *Moore*, our supreme court also recently noted that "even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel. This serves both the ends of justice and judicial economy." (Emphasis in original.) *Roddis*, 2020 IL 124352, ¶ 61.

¶ 85    Here, as set forth, defendant was never given the opportunity to establish possible neglect of the case in a nonadversarial proceeding, contrary to the mandate. New counsel was allowed absent any analysis as to whether that was necessary or any analysis as to the baseline merits of the claims. In addition, the court's failure to conduct a preliminary *Krankel* inquiry into defendant's *pro se* ineffective assistance of trial counsel claims violated principles of judicial economy. Defendant first raised his *Krankel* claim in April of 2013. Following the direct appeal,

the cause appeared before the new judge on remand in August 2017. A proper preliminary hearing may have disposed of most, if not all, of defendant's ineffective assistance of counsel claims. Instead, defendant's remand counsel requested original discovery, several witnesses had to be subpoenaed, and the cause lingered for four more years, including for one additional year due to Covid delays. It is still lingering on appeal 10 years after the initial *Krankel* complaint. This is the very reason why a proper preliminary *Krankel* inquiry matters. See *Roddis*, 2020 IL 124252, ¶¶ 61, 70 (noting, at the preliminary inquiry stage, a trial court may consider both the facts and legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel).

¶ 86    In addressing the State's argument as to the mandate, the majority notes the State "does not contend the claims in Fleming's first [*Krankel*] motion failed to show that counsel possibly neglected the case," and then goes on to state in a conclusory manner without analysis:  "We find that the circuit court complied with our mandate." See *supra*, ¶ 43. This is not persuasive. The content of defendant's initial *pro se Krankel* motion is a separate matter from whether the circuit court on remand followed the appellate mandate of holding a preliminary hearing. The majority also cites an "apparent split in authority" as justification for the circuit court's failure to follow the mandate. See *supra*, ¶ 44. However, a simple review of supreme court cases, including *Moore* and *Jolly*, in conjunction with defendant's direct appeal would have dispelled any confusion. See *People v. Roddis*, 2020 IL 124352, ¶¶ 49-56, 70 (reaffirming *Moore* and reversing the appellate court judgment).[3] For the reasons stated, I would conclude the circuit court did not comply with our mandate of holding a preliminary *Krankel* inquiry.

---

[3]Notably, in *Moore*, the trial court failed to conduct any preliminary *Krankel* inquiry, and the supreme court issued the same remedy on remand as in *Jolly*. The *Moore* court emphasized that it was not remanding the case for a full evidentiary hearing with the appointment of counsel on the ineffective assistance claim:  "Rather, we remand the cause for the limited purpose of allowing the trial court to

¶ 87 Notwithstanding that conclusion, I disagree with the State's remaining argument on the effect of the court's failure to follow the mandate and thus concur in the majority's judgment. Citing the principle that a trial court lacks the authority to exceed the scope of the appellate mandate (*In re Marriage of Jones*, 2019 IL App (5th) 180388, ¶ 23), the State contends that the *Krankel* court on remand acted without jurisdiction and therefore its order must be vacated, along with defendant's motions for an evidentiary hearing under *Krankel*.

¶ 88 Here, the circuit court did not, as a result, lose jurisdiction; it still had the power to determine the case (subject matter jurisdiction) and to bring defendant into its adjudicative process (personal jurisdiction). See *People v. Castleberry*, 2015 IL 116916, ¶ 12 (noting, jurisdiction consists of those two elements); see also *People v. Price*, 2016 IL 118613, ¶¶ 30-31 (reaffirming *Castleberry* and noting, "only the most fundamental defects warrant declaring a judgment void"). Indeed, as set forth, *Krankel* and its progeny permit a court to proceed to an evidentiary hearing. See *Roddis*, 2020 IL 124252, ¶ 53 (noting, *Moore* establishes a minimum for the initial *Krankel* inquiry); *People v. Abraham*, 324 Ill. App. 3d 26, 30 (2001) (noting, matters that are implied by the mandate are considered embraced by it). The judgment therefore was not void for lack of jurisdiction, but rather voidable. See *Castleberry*, 2015 IL 116916, ¶ 11. A voidable judgment is one entered erroneously by a court having jurisdiction. *Id.*; see also *People ex rel. Alvarez v. $59, 914 United States Currency*, 2022 IL 126927, ¶ 86 (same).

¶ 89 The trial court's mistake of law and fact in failing to follow the mandate therefore did not deprive the circuit court (or this court) of the authority to review defendant's claims as they relate

---

conduct the required preliminary investigation. If the court determines that the claim of ineffectiveness is spurious or pertains only to trial strategy, the court may then deny the motion and leave standing defendant's convictions and sentences." *Moore*, 207 Ill. 2d at 81-82.

to the evidentiary hearing. See *People v. Cole*, 2016 IL App (1st) 141664, ¶ 35 (a court will not lose jurisdiction because it makes a mistake in determining either the facts, the law or both). Indeed, in this case, both defendant and the State basically acquiesced to the court's automatic appointment of new counsel and proceeding to an evidentiary hearing on defendant's ineffective assistance of counsel claims. To permit the State to now benefit from a position contrary to that before the trial court would be unjust. See *People v. Trice*, 2017 IL App (1st) 152090, ¶ 59.

¶ 90 In addition to the majority's problematic handling of the appellate mandate issue, I do not believe the majority draft adequately addresses the State's various forfeiture arguments. See *Zander v. Carlson*, 2020 IL 125691, ¶ 34 (suggesting forfeiture should be addressed unless there's a persuasive reason why a reviewing court should overlook it). For example, the State maintains defendant forfeited his claim that trial counsel was ineffective for failing to impeach James with his preliminary hearing testimony. The State notes that this was a matter of record and therefore could have been raised on direct appeal, while defendant counters that he cannot be faulted for failing to raise issues in his first direct appeal due to the very ineffectiveness of his trial attorneys. Defendant, however, was represented by the State Appellate Defender's office on his first direct appeal, and nothing precluded the appellate defender from arguing ineffective assistance claims that were reliant on the record, consistent with our long-time body of case law. See *People v. English*, 2013 IL 112890, ¶ 22. I would therefore hold the matter forfeited, although even addressing the merits does not help defendant any either.

¶ 91 As to the merits, regarding defendant's prison clothing, I would add that defendant fails to cite any authority that defense attorneys generally are *required* to provide or deliver their clients civilian clothing for trial. Under Illinois law, a defendant need only have an opportunity to secure civilian clothing. See *People v. Wilder*, 325 Ill. App. 3d 987, 995 (2001). Also, although the initial

*Krankel* hearing is essentially a nullity due to the State's involvement, I still think it's appropriate to take into account the observations of the judge who oversaw defendant's trial. See *People v. Wright*, 194 Ill. 2d 1, 16 (2000); *Bjorkstam v. MPC Products Corp.*, 2014 IL App (1st) 133710, ¶ 23 (a reviewing court may affirm on any basis in the record, regardless of whether the circuit court relied on that basis or whether its reasoning was correct). In the initial hearing, the trial judge noted she generally makes "every effort possible to ensure that the jury is completely unaware of the defendant's custody status." She further stated that she would "never **** have the defendant walk out in pants that had Cook County DOC on them[.]" The trial judge recalled that defendant wore a civilian shirt and beige khaki pants, and there was "no hint that he was in custody." The court stated, "*** I want to make very clear, there's no marking on those pants. He's behind the table where you can't even see." Additionally, she observed that defendant's attorneys were experienced criminal attorneys who would have sought a continuance had defendant appeared in DOC clothing before the jury. Defendants' attorneys essentially verified these facts. These observations from the individuals present at trial support the *Krankel* court's determination on remand.

¶ 92   I find that on this record, defendant has failed to establish, first, that he was even dressed in identifiable prison attire before the jury; second, that his attorneys could be held deficient for not providing him clothing; and third, any possible prejudice in this case, even assuming the latter point was proven. See *Lee,* 325 Ill. App. 3d at 652; *People v. Medley*, 111 Ill. App. 3d 444, 448 (1983) (noting, the defendant's clothing consisting of a pale green shirt and pants similar to that worn by surgeons was not identifiable prison garb).

¶ 93   To the extent the majority draft addresses defendant's contention that his counsel was ineffective for failing to establish an alleged rifle was used in the shooting, I would add that

defendant has not submitted to this court any trial exhibits, let alone any of the exhibits referenced in the posttrial motion or at his *Krankel* hearing. Yet, it is defendant's burden as the appellant to provide a sufficiently complete record on appeal so that this court can be fully informed about the issues, and absent a complete record, it is presumed the trial court's judgment conforms to the law and has a sufficient factual basis. *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 34. In other words, any doubts arising from this incomplete record are resolved against defendant. See *id*.

¶ 94     For the reasons stated, I specially concur in the judgment.